COLUMBUS & FRANKLIN COUNTY METROPOLITAN PARK DISTRICT ET AL., APPELLEES, *v.* SHANK, DIRECTOR OF ENVIRONMENTAL PROTECTION, ET AL., APPELLANTS.

[Cite as *Columbus & Franklin Cty. Metro. Park Dist. v. Shank* (1992), 65 Ohio St.3d 86.]

(No. 91–1721—Submitted May 6, 1992—Decided November 10, 1992.)

90

92

94

*Porter, Wright, Morris & Arthur, Christopher R. Schraff, Judith L. French–Berry; Ronald J. O'Brien,* City Attorney, *Daniel W. Drake* and *Thomas P. Behlen,* Assistant City Attorneys, for appellees.

*Lee I. Fisher,* Attorney General, and *Retanio Aj Rucker,* Assistant Attorney General, for appellant Director of Environmental Protection.

*Samuels & Northrop Co., L.P.A., David E. Northrop* and *Stephen P. Samuels,* for appellants Jefferson Water & Sewer District and Lionmark Development Partners.

*Michael H. Cochran,* urging reversal for *amicus curiae,* Ohio Township Association.

Sweeney, J.

I

The present controversy centers on the application of the state antidegradation rule embodied in Ohio Adm.Code 3745-1-05. However, a thorough understanding of this regulation is impossible without considering the history of federal and state efforts to reduce widespread water pollution, the current statutory approach to the elimination of pollution and the role of the federal antidegradation standard in furthering this national policy. For a detailed history of federal legislation in this area, see Appendix.

The Water Quality Act of 1965, Pub.L. No. 89-234, 79 Stat. 903, required states to establish water quality standards, and authorized federal enforcement against polluters. Pollution control based on water quality standards was difficult due to the need to show that a particular source of pollution had reduced water quality below the standard.

Therefore, in 1972 Congress directly controlled the discharge of pollutants. Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92-500, 86 Stat. 816. The 1972 Amendments established a fundamentally different approach to prevention and abatement of water pollution. Rather than relying on water quality standards, the 1972 Act established effluent limits for all point sources of pollution. The effluent limits were incorporated into National Pollutant Discharge Elimination System ("NPDES") permits issued to point sources.

Effluent limits were based on levels of technology. For existing private industrial point sources, the least stringent level, to be attained by 1977, was the best practicable control technology currently available ("BPTCA"). Section 1311(b)(1)(A), Title 33, U.S.Code. The next level, to be achieved by 1983, was the best available technology economically achievable ("BATEA"). Section 1311(b)(2)(A), Title 33, U.S.Code.

In contrast to existing sources, new sources of pollution are required to use a higher level of technology, the best available demonstrated control technology ("BADCT"). Section 1316(a)(1), Title 33, U.S.Code. Unlike BPTCA and BATEA, BADCT is not determined by the best performer (BATEA) or the average of best performers (BPTCA) in an industrial category. Instead, it may be based on innovative processes on the forefront of science, engineering and technology.

Publicly owned treatment works ("POTWs") are required by Sections 1311(b)(1)(B) and (C), Title 33, U.S.Code to use secondary treatment technologies, which are tantamount to the BPTCA. See Congressional Research Service, A Legislative History of the Water Pollution Control Act Amend-

ments of 1972 (Comm.Print 1973), at 169–170, cited in *Am. Frozen Food Inst. v. Train* (C.A.D.C.1976), 539 F.2d 107, 119.

In addition to these technology-based direct limits on effluents, water quality standards remain as a basis for pollution control under the 1972 Amendments. If the required level of technology is insufficient to meet the applicable water quality standard, additional pollution control strategies must be employed. See *Arkansas v. Oklahoma* (1992), 503 U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239.

Ohio water quality standards, as required by Section 1313(a), Title 33, U.S.Code, and R.C. 6111.041, are prescribed in Ohio Adm.Code Chapter 3745–1. Quantitative criteria state the maximum permissible concentrations of particular pollutants, or maximum mortality rates of waterborne organisms. Narrative criteria state actual and desired uses for bodies of water (such as warmwater habitats), and limit effluents to levels that protect these uses.

Federal law also requires states to adopt an antidegradation policy that protects high quality waters. In this regard, Section 131.12, Title 40, C.F.R. states as follows:

"(a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

"(1) *Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.*

"(2) *Where the quality of the waters exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds,* after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, *that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources* and all cost-effective and reasonable best management practices for nonpoint source control.

"(3) *Where high quality waters constitute an outstanding National resource, such as waters of National and State parks* and wildlife refuges and waters of exceptional recreational or ecological significance, *that water quality shall be maintained and protected.*" (Emphasis added.)

On April 4, 1985, the OEPA promulgated its current antidegradation policy. Ohio Adm.Code 3745-1-05 provides as follows:

"(A) *Existing instream water uses* as defined in rule 3745-1-07 of the Administrative Code and designated in rules 3745-1-08 to 3745-1-32 of the Administrative Code, *shall be maintained and protected. No further water quality degradation which would interfere with or become injurious to existing designated uses is allowable.*

"(B) *Waters in which existing water quality is better than the criteria prescribed in these rules and exceeds those levels necessary to support propagation of fish, shellfish and wildlife and recreation in and on the water shall be maintained and protected. However, the director of Ohio environmental protection agency may,* after compliance with public notice and intergovernmental coordination requirements listed at 40 CFR part 25 and part 29, and after due consideration of such technical, economic, social and other criteria as provided by sections 301 and 302 of the act, 33 U.S.C. sections 1311 and 1312, *choose to allow lower water quality. Degradation of water quality shall not interfere with or become injurious to existing or planned uses, and the director shall require that the most stringent statutory and regulatory controls for waste treatment be employed by all new and existing point sources,* and that feasible management or regulatory programs pursuant to sections 208 and 303 of the act, 33 U.S.C. sections 1288 and 1313, be applied to nonpoint sources.

"(C) *'State resource waters' are surface waters of the state that lie within* national, state and *metropolitan park systems,* wetlands, and wildlife refuges, areas, and preserves, and also include wild, scenic and recreational rivers, publicly owned lakes and reservoirs and waters of exceptional recreational or ecological significance (e.g., waters which provide a habitat for identified threatened or endangered species) as determined by the director of Ohio environmental protection agency. *Present ambient water quality in state resource waters will not be degraded for all substances determined to be toxic or to interfere with any designated use as determined by the director of Ohio environmental protection agency. All other substances shall be limited to the criteria associated with each designated use, as outlined in rules 3745-1-07 to 3745-1-32 of the Administrative Code.* Areas that do not meet general water quality standards as defined in rules 3745-1-07 to 3745-1-32 of the Administrative Code shall not be degraded as stated above for all such classified areas." (Emphasis added.)

Ohio Adm.Code 3745-1-09 designated Blacklick Creek as an exceptional warmwater habitat. Ohio Adm.Code 3745-1-07 provided in relevant part:

"Water quality standards consist of two parts: designated uses and numerical or narrative criteria designed to protect the uses. Each water body in the state is assigned one or more aquatic life habitat use designations or the nuisance prevention use designation. Each water body may be assigned one or more water supply use designations and/or one recreational use designation. *In addition, a water body may be designated as a state resource water as described in the antidegradation policy (rule 3745–1–05 of the Administrative Code).* * * *" (Emphasis added.)

Thus, former Ohio Adm.Code 3745–1–07 recognized the distinction between water quality criteria associated with a particular use and the separate requirements of the state antidegradation policy. Likewise, Ohio Adm.Code 3745–1–09, which designated Blacklick Creek as an exceptional warmwater habitat, provides in relevant part:

"(A) * * * Each water body may be assigned one or more water supply use designations and/or one recreational use designation. *In addition, a water body may be designated as a state resource water as described in the antidegradation policy. The most stringent criteria associated with any one of the use designations assigned to a water body will apply to that water body.*" (Emphasis added.)

On February 4, 1987, the Clean Water Act was amended. Pub.L. No. 100–4, 101 Stat. 7. Significantly, Congress specifically incorporated the antidegradation standard into law. Addressing the requirements for state water quality standards, the Water Quality Act of 1987 enacted new Subparagraph 303(d)(4)(B), Section 1313(d)(4)(B), Title 33, U.S.Code, which limited state revisions to such standards. This subparagraph provides:

"(4) Limitations on revision of certain effluent limitations.—

" * * *

"(B) Standard attained.—*For waters identified under paragraph (1)(A) where the quality of such waters equals or exceeds levels necessary to protect the designated use for such waters* or otherwise required by applicable water quality standards, *any effluent limitation* based on a total maximum daily load or other waste load allocation established under this section, *or any water quality standard* established under this section, *or any other permitting standard may be revised only if such revision is subject to and consistent with the antidegradation policy established under this section.*" (Emphasis added.) 101 Stat. at 69.

The importance of this amendment, in addition to requiring states to incorporate the antidegradation policy into their water quality standards, is its recognition of the distinction between water quality sufficient to support a

designated use and the more exacting and variable antidegradation standard which is based on existing water quality. See Note, Nondegradation of Water Quality: The Need for Effective Action (1975), 50 Notre Dame Law. 890, 900, fn. 82. In this respect, it codifies the interpretation of the rule by the USEPA, courts and commentators.

The Ohio antidegradation policy is required by federal law, Section 1313(d)(4)(B), Title 33, U.S.Code; Section 131.6, Title 40, C.F.R., and state law, R.C. 6111.041; *Northeast Ohio Regional Sewer Dist. v. Shank* (1991), 58 Ohio St.3d 16, 21, 567 N.E.2d 993, 998, to conform to federal water quality standards. These standards require the establishment of an antidegradation policy that generally prohibits any deterioration of water quality even where the existing level exceeds that necessary to support a designated use. Nevertheless, appellants contend that Ohio Adm.Code 3745-1-05 permits deterioration to a point short of interference with the designated use.

This interpretation conflicts with federal law. The requirements of the Federal Clean Water Act are comprehensive and interconnected. The guiding principle of the Act is that discharge of pollutants into the waters of the nation is unlawful. As an exception to this general prohibition, the Act permits discharge where the point source possesses an NPDES permit authorizing the activity. The permit must, at minimum, incorporate the national technological control requirements applicable to the type of point source. In the case of POTWs, the technology *generally* required is that corresponding to the secondary treatment criteria prescribed by Section 301(b)(1)(B) of the Clean Water Act, Section 1311(b)(1)(B), Title 33, U.S.Code. However, the national technology-based standards constitute the minimum level of effluent control. Even where the prescribed technology is applied, a point source may not discharge effluent which would violate the applicable water quality standards. In the present case, the applicable water quality standard is the current ambient condition of Blacklick Creek inasmuch as the antidegradation policy establishes that quality as the benchmark. Generally, a permit that allows violation of a water quality standard is prohibited. However, Section 131.12, Title 40, C.F.R. allows limited degradation after compliance with the "public participation provisions of the State's continuing planning process." Ohio Adm.Code 3745-1-05(B) specifically refers to the public hearing requirement of Part 25, Title 40, C.F.R.

It is apparent, therefore, that federal law requires these procedural safeguards before degradation may be permitted. Moreover, even if considered in isolation, Ohio Adm.Code 3745-1-05 compels an identical result. Appellants contend that they have complied with Ohio Adm.Code 3745-1-05 because their plants will employ the best available control technology economically achiev-

able ("BATEA"), because BATEA will ensure that water quality is well above the minimum standard corresponding to the applicable use designation and because the plants will not interfere with any existing designated use. Appellants further contend that the court of appeals erred by concluding that "degradation" within the meaning of Ohio Adm.Code 3745–1–05 means any perceptible decrease in water quality.[16] While appellants make much of the absence of the "perceptible change" language in Ohio Adm.Code 3745–1–05, a review of the rule clearly indicates that no degradation of a stream designated for special protection can occur unless and until the procedural safeguards embodied in Parts 25 and 29, Title 40, C.F.R. are met.

Appellants interpret the term "existing water quality" in Ohio Adm.Code 3745–1–05(B) as meaning that which supports "existing designated uses" as that term is employed in Ohio Adm.Code 3745–1–05(A). The interpretation urged by appellants, however, would make subsections (A) and (B) of Ohio Adm.Code 3745–1–05 redundant and would render meaningless the language of subsection (B) that "[w]aters in which existing water quality is better than the criteria prescribed in these rules * * * shall be maintained and protected." Thus, the only reasonable interpretation of Ohio Adm.Code 3745–1–05(B) is that it protects, as it clearly states, waters currently exceeding existing water quality standards.

While appellants disparage the court of appeals for employing language not contained in the rule, a perceptible change in water quality is clearly what Ohio Adm.Code 3745–1–05(B) was intended to prevent. Furthermore, their attempt to equate degradation of existing water quality with an interference with an existing use not only creates a redundancy but also renders the first and third sentences of subsection (B) inconsistent. The first sentence of subsection (B) provides a general rule against degradation of water quality. The second sentence provides that departure from this ideal may occur only after compliance with certain procedural requirements. The third sentence states that any permitted degradation is limited to that which occurs *despite* the most stringent statutory and regulatory controls for waste treatment.

---

16. The court of appeals derived the perceptible change standard from the decision of the Tenth Circuit Court of Appeals in *Oklahoma v. United States Environmental Protection Agency* (C.A.10, 1990), 908 F.2d 595. The previous discussion reveals our belief that this standard is consistent with federal statutory law, federal administrative regulations and the decisions of the state and federal courts which have considered the issue. We are not unmindful of the reversal of the Tenth Circuit judgment by the United States Supreme Court in *Arkansas v. Oklahoma, supra*, 503 U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239. However, a careful reading of the latter decision reveals that the Supreme Court did not disagree with the perceptible change standard.

The interpretation urged by appellants ignores the incremental nature of any departure from the ideal of nondegradation. Instead, they would interpret Ohio Adm.Code 3745-1-05 to allow the Director to permit BATEA regardless of its impact on the stream so long as it does not interfere with existing uses or cause the stream to exceed the numerical limitations embodied in water quality standards. This interpretation, in turn, would eviscerate the rule because it allows a clear degradation of water quality to be considered nondegradation. It also renders meaningless the requirement that degradation be allowed only after a public hearing has been held resulting in a determination by the Director that technical, social and economic factors justify degradation.

Moreover, the Director and EBR have interpreted Ohio Adm.Code 3745-1-05 in such a manner that the designated use dictates the required level of technology. This interpretation violates the central principle of federal and state water pollution efforts since the adoption of the 1972 Amendments. Essentially, state environmental officials began with an erroneous frame of reference (*i.e.,* water quality criteria associated with a designated use). From that, they derived a technological standard that limits pollutants to a level consistent with water quality criteria for exceptional warmwater habitats. This approach has numerous deficiencies. First, the analysis proceeds from a false premise that the applicable water quality standard is determined by the use designation rather than the antidegradation policy. Second, it presumes that effluent limitations are dictated by the assimilative capabilities of the receiving stream. However, water quality standards as the primary method of pollution abatement were expressly rejected by Congress in the 1972 Amendments. Rather, reference to water quality standards is appropriate only where use of the required technology results in violation of state water quality standards. Finally, the appropriate technology should be determined only *after* the public hearing and *after* limited degradation is allowed by state authorities.

Appellants argue that we must defer to the agency's interpretation of the legislation and regulations it enforces. However, as observed by the United States Supreme Court:

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." (Footnote omitted.) *Chevron U.S.A., Inc. v. Natural Resources*

*Defense Council, Inc.* (1984), 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, 702–703.

Consequently, where a statute or administrative regulation is unambiguous, there is no need for statutory construction.[17]  See *Sears v. Weimer* (1944), 143 Ohio St. 312, 28 O.O. 270, 55 N.E.2d 413, paragraph five of the syllabus. Inasmuch as the agency's interpretation of Ohio Adm.Code 3745–1–05 is at variance with its plain language, the interpretations of its federal counterpart and the clear intent of the Federal Clean Water Act, we decline to adopt it. Moreover, our view of Ohio Adm.Code 3745–1–05 is consistent with the interpretation given analogous regulations of other states which require that a hearing be held and findings of social and economic necessity be made before degradation of high quality waters will be permitted.  See *Ex parte Fowl River Protective Assn.* (Ala.1990), 572 So.2d 446, 456.

We therefore reject the transpositional interpretation of the state antidegradation rule advanced by appellants and conclude that, pursuant to Ohio Adm.Code 3745–1–05, the Ohio Director of Environmental Protection may not issue a permit authorizing an activity that would degrade waters which exceed water quality standards unless (1) he has complied with the public notice and intergovernmental coordination requirements of Parts 25 and 29, Title 40, C.F.R., (2) he has conducted a public hearing to consider the technical, economic and social criteria provided in Sections 1311 and 1312, Title 33, U.S.Code, and (3) as a result of the public hearing, he has chosen to allow lower water quality in the receiving stream.  Where this determination has been made, the degradation of water quality must be kept to an absolute minimum by the employment of the most stringent statutory and regulatory controls for waste treatment and under no circumstances may such degradation interfere with or become injurious to any existing or planned uses of the receiving waters.

The "degradation" of high quality waters within the meaning of Ohio Adm.Code 3745–1–05 occurs whenever the permitted activity increases the amount of pollutants.

## II

Our decision today therefore necessitates that the present cause be remanded to the Director for a public hearing pursuant to Ohio Adm.Code 3745–1–

---

17. Conversely, where uncertainty exists regarding legislative or administrative intent in the drafting of a statute or regulation, all rules of construction are available to assist a reviewing court.  In the present context, such aids would include the rule of construction that environmental statutes are to be liberally construed to effect their purposes.  See *United States v. Johnson & Towers, Inc.* (C.A.3, 1984), 741 F.2d 662, 666; *United States v. Frezzo Bros., Inc.* (C.A.3, 1979), 602 F.2d 1123, 1128.

05(B). This is not the end of our discussion, however. Ohio Adm.Code 3745–1–05 requires that, prior to allowing degradation of high quality waters, the Director must consider "technical, economic, social and other criteria." The rule refers to the analysis undertaken pursuant to Sections 301 and 302 of the Clean Water Act, Sections 1311 and 1312, Title 33, U.S.Code. In particular, former Section 1312(b)(1), to which Ohio Adm.Code 3745–1–05 refers,[18] provided as follows:

*"Prior to establishment of any effluent limitation* pursuant to subsection (a) of this section, *the Administrator shall issue notice of intent to establish such limitation and* within ninety days of such notice *hold a public hearing to determine the relationship of the economic and social costs of achieving any such limitation or limitations,* including any economic or social dislocation in the affected community or communities, *to the social and economic benefits to be obtained (including the attainment of the objective of this chapter) and to determine whether or not such effluent limitations can be implemented with* available technology or *other alternative control strategies."* (Emphasis added.) Former Section 302(b)(1) of the Act, 86 Stat. 846, superseded by Pub.L. No. 100–4, 101 Stat. at 39, now codified at Section 1312(b)(1), Title 33, U.S.Code.

The exception to antidegradation contained in Ohio Adm.Code 3745–1–05(B) is narrow. Moreover, during any *de novo* proceeding which could result in the issuance of an NPDES permit, the burden of proof is upon the applicant to establish that it was reasonable for the Director to find that the conditions for its issuance have been met.[19] See *Broadway Christian Church v. Williams* (1978), 59 Ohio App.2d 243, 255, 13 O.O.3d 249, 256, 394 N.E.2d 339, 347. This standard has particular significance in the antidegradation context. See Hines, A Decade of Nondegradation Policy in Congress and the Courts: The Erratic Pursuit of Clean Air and Clean Water (1977), 62 Iowa L.Rev. 643, 652, 654; Van Putten & Jackson, The Dilution of the Clean Water Act (1986), 19 U.Mich.J.L.Ref. 863, 899; Anderson, Water Quality Planning for the National Forests (1987), 17 Envtl.L. 591, 622. In the case at bar, therefore, appellants bore the burden of establishing that the Director was reasonable in deciding that degradation of water quality in Blacklick Creek "is necessary to accom-

---

18. Since the adoption of Ohio Adm.Code 3745–1–05 on April 4, 1985, Section 1312(b)(1), Title 33, U.S.Code has been amended, effective February 4, 1987, altering the public hearing requirement. Pub.L. No. 100–4, 101 Stat. 7, 39–40. However, inasmuch as the rule was based on the earlier federal statute and the rule has not been amended since the statute's amendment, we must interpret the rule in accordance with the statute in effect when the rule was adopted.

19. Accordingly, the EBR erred in concluding that appellees, as challengers to the issuance to the permit, bore the burden of proof.

modate *important* economic or social development in the area in which the [stream is] located." (Emphasis added.) Section 131.12(a)(2), Title 40, C.F.R. Obviously, one such economic consideration is whether the proposed developments are feasible if no degradation is allowed. However, former Section 1312(b)(1), as incorporated by reference into Ohio Adm.Code 3745–1–05, required the Director to consider alternative control strategies to achieve the desired effluent limitations. It is evident that the desired effluent limitation is zero. Thus, the Director must consider alternative control strategies which would permit development but result in zero discharge to the receiving stream. One such alternative is the centralized wastewater treatment provided by Columbus. See *Oklahoma v. United States Environmental Protection Agency* (C.A.10, 1990), 908 F.2d 595, 615, reversed on other grounds *sub nom. Arkansas v. Oklahoma* (1992), 503 U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239. Given the close proximity of the Columbus sewer interceptor line to the proposed plant, such an alternative must be considered.

Furthermore, in considering economic and social factors, the Director should not limit his inquiry to effects upon the locality served by the facilities. Rather, these considerations necessarily involve the impact of various alternatives on the greater community. See Van Putten & Jackson, *supra*, 19 U.Mich.J.L.Ref. at 899. The alternative of centralized treatment has many economic, environmental and public policy attributes. Most notable is the Congressional intent to promote centralization. In this regard, Section 101(a)(5) of the Clean Water Act, Section 1251(a)(5), Title 33, U.S.Code, provides:

"[I]t is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State[.]" See, also, Sections 1281(a) and (c), 1288(b)(1), (b)(2)(C)(i) and (c)(1), Title 33, U.S.Code, discussed *supra*.

The policy favoring centralization pervades the Clean Water Act. See *Chemical Manufacturers Assn. v. United States Environmental Protection Agency* (C.A.5, 1989), 870 F.2d 177, 195. In particular, Section 208(e) of the Act, Section 1288(e), Title 33, U.S.Code, provides that no NPDES permit may be issued which conflicts with an areawide wastewater treatment plan.

Moreover, any consideration of economic and social criteria must not disregard the substantial investment by federal, state and local governments in developing areawide waste treatment systems. In Ohio alone, approximately $4 billion in public funds have been invested to upgrade such systems. See OEPA Ohio Water Resource Inventory, Executive Summary (1992) 3. Since 1970, these investments have dramatically improved Ohio water quality. *Id.* The elimination of the Reynoldsburg treatment plant on Blacklick Creek was

possible because of the expansion of the Columbus centralized treatment system, and the substantial improvement in the quality of Blacklick Creek bears testament to the wisdom of the federal construction grant program.

The social and environmental consequences of ignoring the crucial role of centralized wastewater treatment in the development of the Columbus metropolitan area cannot be overstated. In particular, the remarkable improvement in the Scioto River south of the Columbus Southerly and Jackson Pike facilities, *id.* at 5, is as much a function of local as of federal investment. This local share, based as it is on the contributions of the numerous ratepayers of the Columbus system, allows Columbus to spread the cost of needed improvements over many customers and to achieve the economies of scale necessary to invest in advanced treatment technologies.[20] The use of package facilities throughout the area currently served by the Columbus system or within its planning area would not only degrade the receiving stream but would undermine the financing of state-of-the-art technology on a regional basis. Accordingly, any consideration of social or economic criteria pursuant to Ohio Adm.Code 3745–1–05 must take account of the objective of the Clean Water Act that rivers and streams are not to be conduits for wastewater. This is particularly the case where a well-constructed network for transmitting domestic sewage is available.

### III

The public hearing to which Ohio Adm.Code 3745–1–05(B) refers is directed to ascertaining whether social and economic factors justify limited degradation of high quality waters. Where the Director finds that these factors justify such degradation, he "shall require that the most stringent statutory and regulatory controls for waste treatment be employed by all new and existing point sources." Appellants do not dispute that Ohio Adm.Code 3745–1–05(B) demands technology beyond that required when the receiving waters

---

20. Indeed, one of the witnesses for appellants acknowledged that denitrification would achieve a higher quality of effluent than that produced by the proposed facilities.

The witness further acknowledged that such technology was in use at larger plants. However, the witness stated that denitrification was rejected for the facilities in question because the limited capacity of these facilities did not justify the expense. The ability of large areawide treatment plants such as the Columbus Southerly facility to purchase such technologies is one major reason that such plants are promoted by the Clean Water Act. In any event, denitrification is clearly an available and proven technology which must be considered in the development of BADCT for the JWSD and Lionmark facilities. See *Armco, Inc. v. United States Environmental Protection Agency* (C.A.6, 1989), 869 F.2d 975, 981.

are not of high quality.[21]  In this respect, appellants are correct.  However, their insistence that the required technology is only that necessary to support the designated use and that implementation of such technology obviates the public hearing requirement understates the level of technology required by state and federal law, misperceives the method for ascertaining the appropriate technology and mischaracterizes the stage during the regulatory process at which it must be considered.

In considering appellants' arguments, we must therefore determine *when* the appropriate level of technology is ascertained, *how* it is ascertained and *what form* it ultimately takes.

The answer to the first inquiry is provided by Ohio Adm.Code 3745–1–05(B). The relevant technology is determined only after a public hearing has resulted in a decision to allow limited degradation of high quality waters.

*How* the technology is determined is governed by the Clean Water Act and state antidegradation policies.  The Act generally precludes any effluent discharge which would adversely affect high quality waters.  As a narrow exception, Ohio Adm.Code 3745–1–05(B) and its federal counterpart permit degradation, but only contingent upon use of the most stringent statutory and regulatory controls.

Accordingly, the rule also provides an answer as to *what* "the most stringent statutory and regulatory controls" means.  While appellants concede that this language mandates a high level of technology, they insist that the required technology is BATEA.  However, since the 1977 amendments to the Act, BATEA is no longer applicable to conventional pollutants.  Moreover, BATEA is not the *most* stringent level of control required by Ohio Adm.Code 3745–1–05(B) and its federal counterpart.  Accordingly, the appropriate level of technology applicable to a new point source proposed to be located on a high quality body of water is that represented by BADCT.[22]

---

21.  This acknowledgment appears to conflict with the testimony adduced before the EBR.  A witness who testified for *appellants* remarked that the facilities in question employed "conventional" technology.  See fn. 15, *supra*.  If, by this statement, the witness was suggesting that the facilities can achieve a level of effluent reduction which corresponds to secondary treatment standards, that level does not meet the requirement of Ohio Adm.Code 3745–1–05(B) that the most stringent statutory and regulatory controls be employed.  Conventional plants employing secondary treatment technologies have achieved the *minimum* level of effluent control, not the *maximum* level required by the rule.

22.  Indeed, as one commentator has observed:
    "Any new source of pollutant discharge must achieve effluent reduction reflecting 'best available demonstrated control technology (hereinafter BADCT).'  EPA has published regulations defining effluent limits which reflect BADCT for various industrial categories.  The Udall nondegradation statement does not prohibit new discharge into high-quality waters, but only

Determination of BADCT for the facilities at issue is not insurmountable. First, the USEPA possesses extensive experience in developing BADCT standards for private point sources discharging conventional pollutants. See, *e.g.,* *Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra,* 870 F.2d at 263; *Am. Paper Inst. v. Train* (C.A.D.C.1976), 543 F.2d 328, 355; *Reynolds Metals Co. v. United States Environmental Protection Agency* (C.A.4, 1985), 760 F.2d 549, 557. Second, the Director may be further guided by examining technologies such as advanced secondary treatment, see *Am. Paper Inst. v. United States Environmental Protection Agency* (C.A.4, 1981), 660 F.2d 954, 962, fn. 18, or best practicable waste treatment technology over the life of the works.[23] If either standard is comparable to BADCT, the Director need inquire no further.[24] Where greater effluent reductions may be achieved by transfer technology, such technology must be utilized.

Accordingly, a lack of national new-source performance standards for domestic wastewater treatment does not prevent the development of site-specific effluent limitations based on BADCT. See *E.I. du Pont de Nemours & Co. v. Train* (1977), 430 U.S. 112, 122, 97 S.Ct. 965, 972, 51 L.Ed.2d 204, 213–314. The director of a state agency to which the federal government has delegated the authority to issue permits enjoys the same authority as the Administrator of USEPA. See Section 1342(b), Title 33, U.S.Code. Such authority includes the ability to condition the permit on technological standards which exceed national standards when necessary to address site-specific concerns including water quality criteria. Likewise, the Administrator may

---

requires application of 'the highest and best degree of waste treatment available under existing technology.' If this standard is any different than BADCT, the difference would hardly be worth the effort of promulgating regulations to define." Note, *supra,* 50 Notre Dame Law. at 897.

23. Stricter effluent standards applicable to POTWs are clearly envisioned by the Act. See Section 1311(b)(1)(C), Title 33, U.S. Code. Technology sufficient to achieve these standards is promoted by the federal grant program under Section 201 of the Clean Water Act, Section 1281(g)(2)(A), Title 33, U.S. Code. This level of technology was originally required of *all* POTWs by July 1, 1983. See Section 301(b)(2)(B), Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 845. While this requirement was removed from the Clean Water Act by the 1981 Amendments, 95 Stat. 1623, 1632, it nevertheless continues to represent a level of technology capable of achieving a greater degree of effluent control.

24. Such examples are for illustrative purposes only. Obviously, the benchmark remains BADCT. Thus, it is the duty of the Director, in the first instance, to determine the level of technology which achieves the greatest degree of pollution reduction. This determination would be made only after the Director, following the public hearing, has allowed limited degradation of high quality waters to occur. It is at this stage of the process that he would consider an application for a permit to install.

prescribe requirements where no national standards exist. See *Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra,* 870 F.2d at 206–207; *Natural Resources Defense Council, Inc. v. Costle* (C.A.D.C.1977), 568 F.2d 1369, 1378; *Montgomery Environmental Coalition v. Costle* (C.A.D.C.1980), 646 F.2d 568, 586; Van Putten & Jackson, *supra,* 19 U.Mich.J.L.Ref. at 879, 882. In fact, it has been held in another context that site-specific permit conditions prescribed pursuant to the best professional judgment of the regulator will generally prevail over subsequently promulgated national standards which are less stringent. *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency* (C.A.D.C.1988), 859 F.2d 156, 195, 201; Van Putten & Jackson, *supra,* 19 U.Mich.J.L.Ref. at 882–883, fn. 86.

In determining the appropriate technology, the Director is required to consider its costs. Section 1316(b)(1)(B), Title 33, U.S.Code.

This standard would likewise apply to the determination of BADCT in this case. However, the regulatory authority is to consider cost on an industry-wide basis and is not to limit its analysis to the financial ability of the individual discharger. *Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra,* 870 F.2d at 219–220, fn. 157, and 262. Moreover, it has been held that cost is less of a factor for new sources than for existing sources. *Id.* at 196. Additionally, the expense of the technology is not to be weighed against the water quality benefits to be derived therefrom. Rather, the regulatory authority "must consider only 'the cost of achieving such effluent reduction.'" *Am. Paper Inst. v. Train, supra,* 543 F.2d at 338–339. See, also, *Reynolds Metals Co. v. United States Environmental Protection Agency, supra,* 760 F.2d at 565. It is therefore immaterial that small dischargers may be unable to afford the necessary technology where other members of the affected industry are able to do so.[25] See *Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra,* 870 F.2d at 252. In fact, the USEPA has performed industry-wide cost analysis of advanced treatment technologies for POTWs. See *Am. Paper Inst. v. United States Environmental Protection Agency, supra,* 660 F.2d at 964.

Accordingly, we further conclude that the most stringent statutory and regulatory controls for waste treatment to which Ohio Adm.Code 3745–1–05 refers constitute that level of technology applicable to new sources of pollution which achieves the greatest reduction of pollutants. Where the USEPA

---

25. For example, the record before the EBR indicated that denitrification was effective in further reducing the amount of ammonia discharged to a receiving stream. Denitrification not only is a demonstrated technology but is actually in operation in Columbus.

has not prescribed an effluent limitation for a new source category, the Ohio Director of Environmental Protection shall, pursuant to Ohio Adm.Code 3745–31–05(D), require as a condition of the permit the greatest effluent reduction achievable through the best available demonstrated control technology, processes, operating methods or other alternatives.

## IV

The final argument advanced by appellants concerns the timing of the foregoing process. Specifically, appellants contend that the public hearing requirement, the economic and social criteria analysis and the subsequent determination of the appropriate statutory and regulatory controls must precede only the issuance of the NPDES permit and not the issuance of a permit to install a treatment facility. In support of this view, appellants maintain that the reference in Ohio Adm.Code 3745–1–05(B) to federal law evidences the agency's intent that the rule applies only to an NPDES permit. This is so, appellants argue, because NPDES permits are required by federal law while permits to install are creatures of state law. The argument of appellants is without merit. Ohio Adm.Code 3745–1–05, a state regulation, cannot control a federal permit process. Second, there is absolutely nothing in Ohio Adm.Code 3745–1–05 suggesting that the antidegradation inquiry should be delayed until the NPDES permit is considered. Rather, Ohio Adm.Code 3745–31–02(A) requires that an application for a permit to install a disposal system include the plans therefor. Obviously, these plans cannot be approved until the analysis required by Ohio Adm.Code 3745–1–05 has been conducted. Finally, the policy reasons cited by the court of appeals are extremely persuasive. It would indeed be a waste of resources and a distortion of the regulatory process if such an inquiry was undertaken only after a plant is built. Such an interpretation of Ohio Adm.Code 3745–1–05 would also contradict a central premise of the Clean Water Act—that the greatest level of effluent reduction possible should be incorporated into a new facility at the design stage. See Hines, *supra*, 62 Iowa L.Rev. at 701.

We therefore hold that the public hearing requirement to which Ohio Adm.Code 3745–1–05 refers must be satisfied before a permit may be issued to install a new source of pollution pursuant to Ohio Adm.Code 3745–31–02(A).

## V

In summary, the antidegradation policy embodied in Ohio Adm.Code 3745–1–05 cannot be fully understood without considering its federal counterpart and the history and purposes of the Clean Water Act. The unambiguous meaning of the state and federal rules is that any deterioration of high quality waters violates the policy. The existing ambient condition of the receiving

stream thus establishes the applicable water quality standard with which a potential discharger must comply. Accordingly, any discharge which would violate this standard even with the utilization of generally applicable technological controls would normally be prohibited.[26] The antidegradation policy, however, provides a narrow exception to this rule. Limited degradation of high quality waters is permissible but only after compliance with the public hearing requirement of the rule and an administrative decision based thereon that technical, economic and social factors justify the degradation. Any economic and social analysis must consider alternative methods to accommodate the objectives of the proposed facility, the public and private investments in such alternatives and the governmental policy to promote them. If, after this analysis, the Director nevertheless concludes that technical, economic and social factors favor the proposed facility, the facility must incorporate the most stringent statutory and regulatory effluent controls, *i.e.*, BADCT. Finally, this analysis must precede any consideration of an application for a permit to install a treatment facility.

Accordingly, the judgment of the court of appeals is affirmed and the cause is remanded to the Director for proceedings not inconsistent with this opinion.

*Judgment affirmed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

HOLMES, J., concurs in judgment only.

### APPENDIX

A History of Federal Water Pollution Control Legislation

The United States Congress initially attempted to pursue nationwide action against deteriorating water quality by enacting the Federal Water Pollution Control Act on June 30, 1948. 62 Stat. 1155, codified at former Section 1151 *et seq.*, Title 33, U.S.Code. The approach relied upon the states to establish water quality standards failed to provide for any federal review or enforcement and limited the role of the national government to funding state water pollution control activities and providing technical assistance. See Gaba, Federal Supervision of State Water Quality Standards under the Clean Water Act (1983), 36 Vand.L.Rev. 1167, 1177.

To correct the perceived deficiencies in the Water Pollution Control Act of 1948, Congress revised it in 1965. Water Quality Act of 1965, Pub.L. No. 89–234, 79 Stat. 903.

---

**26.** The technological standard with which appellants would normally be required to comply is an effluent limitation achievable through employment of secondary treatment. We assume that the facilities in question have attained this standard.

Subsection 1(a) thereof provided that:

"The purpose of this Act is to *enhance the quality and value of our water resources* and to establish a national policy for the prevention, control, and abatement of water pollution." (Emphasis added.)

The 1965 amendments required states to adopt water quality standards and prescribed federal review and enforcement of these standards. Gaba, *supra,* 36 Vand.L.Rev. at 1177–1178. The Water Quality Act of 1965 further required states to obtain federal approval of water quality standards and the plans for their implementation and enforcement. *Id.* at 1178.[a] Where a state failed to comply, the Secretary of the Interior was authorized to promulgate appropriate regulations. Gaba, *supra,* at 1178–1179.

Section 5(a) of the 1965 Act provided guidance to state and federal authorities regarding the establishment of water quality standards. It provided in part:

"Standards of quality established pursuant to this subsection shall be such as to protect the public health or welfare, *enhance the quality of water* and serve the purposes of this Act. In establishing such standards the Secretary, the Hearing Board, or the appropriate State authority shall take into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other legitimate uses." (Emphasis added.) 79 Stat. at 908.

While the Water Quality Act of 1965 sought to abate and prevent water pollution, it did not expressly address the preservation of high quality waters in their natural state. Hines, A Decade of Nondegradation Policy in Congress and the Courts: The Erratic Pursuit of Clean Air and Clean Water (1977), 62 Iowa L.Rev. 643, 658. Nevertheless, in May 1966, the United States Department of the Interior promulgated guidelines addressing this issue. See U.S. Department of the Interior Federal Water Pollution Control Administration, Guidelines for Establishing Water Quality Standards for Interstate Waters (1966). The guidelines unequivocally provided for maintenance and protection of waters of exceptional quality.[b]

---

a. The agency responsible for the implementation of the Water Quality Act of 1965 was the Federal Water Pollution Control Administration, Department of the Interior. See Gaba, *supra,* at 1179–1180, fn. 66; Hines, A Decade of Nondegradation Policy in Congress and the Courts: The Erratic Pursuit of Clean Air and Clean Water (1977), 62 Iowa L.Rev. 643, 658.

b. The guidelines provided in relevant part:

On February 8, 1968, United States Secretary of the Interior Stewart Udall announced a departmental policy requiring states to incorporate antidegradation provisions into their water quality standards. The antidegradation policy provided that:

" '*Water whose existing quality is better than the established standards as of the date on which such standards become effective will be maintained at their existing high quality. These and other waters of a State will not be lowered in quality unless and until it has been affirmatively demonstrated* to the State water pollution control agency and the Department of the Interior *that such change* is justifiable as a result of necessary economic or social development and *will not interfere with or become injurious to any assigned uses made of, or presently possible in, such waters. This will require that any* industrial, *public* or private *project* or development *which would constitute a new source of pollution* or an increased source of pollution *to high quality waters will be required, as part of the initial project design, to provide the highest and best degree of waste treatment available under existing technology,* and, since these are also Federal standards, these waste treatment requirements will be developed cooperatively.' " (Emphasis added.) U.S. Department of the Interior Federal Water Pollution Control Administration, Compendium of Department of the Interior Statements on Non-degradation of Interstate Waters (Aug. 1968) 1–2, as quoted in Hines, *supra,* 62 Iowa L.Rev. at 659, fn. 53.

---

"1. Water quality standards should be designed to 'enhance the quality of water.' If it is impossible to provide for prompt improvement in water quality at the time initial standards are set, the standards should be designed to prevent any increase in pollution. *In no case will standards providing for less than existing water quality be acceptable.*
"* * *
"5. *Water quality criteria should be accompanied by a description of present water quality and uses, together with uses expected in the future and the water quality required to make those uses possible. The water quality standards proposed by a State should provide for:*
"(a) *Potential and future water uses as well as the present intended use and uses;*
"(b) The upgrading and enhancement of water quality and the use or uses of streams or portions thereof that are presently affected by pollution;
"(c) *The maintenance and protection of quality and use or uses of waters now of a high quality or of a quality suitable for present and potential future uses.*" (Emphasis added.) U.S. Department of the Interior Federal Water Pollution Control Administration, Guidelines for Establishing Water Quality Standards for Interstate Waters (1966) 4. See, also, Hines, *supra,* 62 Iowa L.Rev. at 658.
The guidelines are significant in two respects. First, they state unequivocally that maintenance of existing water quality must be pursued. Second, they distinguish between the maintenance and protection of current water quality and preservation of existing uses.

This policy is significant in three respects. First, it recognizes existing water quality as the benchmark rather than generic water quality standards. Second, it provides that where existing water quality is permitted to decline it may not decline so much as to interfere with a potential or existing use thereof. Finally, the policy requires that the only degradation permissible is that which occurs despite the incorporation at the design stage of the most advanced waste treatment technology currently available.[c]

Every state had incorporated an approved version of the antidegradation requirement into its water quality standards within four years of the announcement of the policy by Secretary Udall. See Hines, *supra*, 62 Iowa L.Rev. at 659–660; Note, Nondegradation of Water Quality: The Need for Effective Action (1975), 50 Notre Dame Law. 890, 893. On July 9, 1970, the United States Environmental Protection Agency ("USEPA") was created. Effective December 2, 1970, the agency assumed responsibility for the enforcement of the Water Quality Act of 1965. Reorganization Plan No. 3 of 1970, 84 Stat. 2086, 2087, Section 2(1).

Meanwhile, Congress had begun to reassess the national water pollution control effort. Despite the expanded federal role in the enforcement of state water quality standards, there was widespread concern that substantial progress toward the goals of the 1965 Act had not been made. See Gaba, *supra*, 36 Vand.L.Rev. at 1179; Pedersen, Turning the Tide on Water Quality (1988), 15 Ecology L.Q. 69, 75. Dissatisfaction with the Water Quality Act was attributable, in part, to the cumbersome process for developing enforceable federal water quality standards. See Gaba, *supra*, 36 Vand.L.Rev. at 1178–1179; Pedersen, *supra*, 15 Ecology L.Q. at 74; *Montgomery Environmental Coalition v. Costle* (C.A.D.C.1980), 646 F.2d 568, 574; *Natural Resources Defense Council v. United States Environmental Protection Agency* (C.A.9, 1990), 915 F.2d 1314, 1316. However, the major deficiency in the 1965 Act was its fundamental reliance on water quality standards as the mechanism for

---

**c.** Statutory authority for the policy was derived from the purposes clause of the Water Quality Act of 1965. Pub.L. No. 89–234, Section 1(a), 79 Stat. 903. Explaining the rationale of the department, Max Edwards, Assistant Secretary of the Interior, remarked:

" 'The purpose and intent of the Water Quality Act of 1965 was to ' * * * enhance the quality and value of our water resources * * * ' and the strategy of water quality standards was to carry out that purpose and intent. *Clearly and simply, where standards as established and enforced result in a lowering of the present high quality to that level, we have not met the intent of the law on the books.*' " (Emphasis added.) U.S. Department of the Interior Federal Water Pollution Control Administration, Compendium of Department of the Interior Statements on Non-degradation of Interstate Waters (Aug. 1968) 43, as quoted in Hines, *supra*, 62 Iowa L.Rev. at 657, fn. 41.

reducing pollution.[d] Difficult problems in identifying pollution sources and establishing causation between the discharge of pollutants and lessened water quality undermined its objectives. See Gaba, *supra*, 36 Vand.L.Rev. at 1179. These shortcomings were inherent in the Act itself.[e]

Accordingly, significant revisions were proposed. The result was the Federal Water Pollution Control Act Amendments of 1972. Pub.L. No. 92–500, 86 Stat. 816. While characterized as amendments, what emerged was a major departure from past attempts to protect water quality. See *Am. Frozen Food Inst. v. Train* (C.A.D.C.1976), 539 F.2d 107, 115. At the outset, the 1972 Amendments set forth a general prohibition against water pollution. Pub.L. No. 92–500, Section 301(a), 86 Stat. 816, 844. The focus of the 1972 Act was therefore upon the discharge of pollutants rather than their effect upon the receiving waters. Thus, it has been observed that:

"With the 1972 Amendments, Congress departed radically from past federal approaches to water pollution control. Congress abandoned the underlying premise of all previous federal water pollution control policies—that water

---

**d.** Water quality standards generally include numerical and narrative criteria describing the chemical or biological condition of the receiving waters and the uses designated therefor. Policy Guideline No. 3 issued by the Department of the Interior in 1966 provided:

"Water quality criteria should be applied to the stream or other receiving water or portions thereof. The criteria should identify the water uses to be protected and establish limits on pollutants or effects of pollution necessary to provide for such uses. Numerical values should be stated for such quality characteristics where such values are available and applicable. Where appropriate, biological bioassay parameters may be used. In the absence of appropriate numerical values or biological parameters, criteria should consist of verbal descriptions in sufficient detail as to show clearly the quality of water intended (*e.g.*, 'substantially free from oil')." U.S. Department of the Interior Federal Water Pollution Control Administration, Guidelines for Establishing Water Quality Standards for Interstate Waters (1966) 4.

**e.** For example, the Water Quality Act of 1965 provided in relevant part:

"*The discharge of matter into such interstate* waters or portions thereof, *which reduces the quality of such waters below the water quality standards established under this subsection* (whether the matter causing or contributing to such reduction is discharged directly into such waters or reaches such waters after discharge into tributaries of such waters), *is subject to abatement* in accordance with the provisions of paragraph (1) or (2) of subsection (g) of this section. * * * *" (Emphasis added.) 79 Stat. at 909.

It has been observed that the deficiencies in the approach taken by the 1965 Act "stemmed from the character of the standards themselves, which focused on the tolerable effects rather than the preventable causes of water pollution * * *." *United States Environmental Protection Agency v. California ex rel. State Water Resources Bd.* (1976), 426 U.S. 200, 202, 96 S.Ct. 2022, 2023, 48 L.Ed.2d 578, 582. Moreover, "the scheme failed to provide adequate incentives to individual entities to pollute less; an entity's dumping [of] pollutants into a stream was ignored if the stream met the standards." *Natural Resources Defense Council v. United States Environmental Protection Agency, supra,* 915 F.2d at 1316.

pollution control should be based on calculating 'acceptable' pollution levels for a particular water body and then allocating this 'assimilative capacity' between pollutant sources. Adoption of the zero discharge goal thus 'marked an entire change in regulatory philosophy.' The premise of the Clean Water Act is that any discharge of pollutants into national waters is unacceptable and should cease as soon as control is technologically and economically feasible." Van Putten & Jackson, The Dilution of the Clean Water Act (1986), 19 U.Mich.J.L.Ref. 863, 866–867.

The 1972 Amendments used significantly different language in describing the purposes of the Act. The Water Quality Act of 1965 had provided as follows:

*"The purpose of this Act is to enhance the quality* and value *of our water resources and to establish a national policy for the prevention,* control, and abatement *of water pollution."* (Emphasis added.) Pub.L. No. 89–234, Section 1(a), 79 Stat. 903.

In contrast, the 1972 Amendments announced the following policy:

*"The objective of this Act is to* restore and *maintain the chemical, physical, and biological integrity of the Nation's waters. * * * "* (Emphasis added.) Pub.L. No. 92–500, Section 101(a), 86 Stat. 816.

While it could be argued that the 1965 Act had already authorized an antidegradation standard by establishing "a national policy for the prevention * * * of water pollution," the 1972 Amendments expressly adopted the antidegradation policy by proclaiming as their objective the restoration *and maintenance* of "the chemical, physical and biological integrity of the Nation's waters." This view is underscored by the Senate Public Works Committee Report on the 1972 Amendments, wherein it was observed:

"Maintenance of such integrity requires that any changes in the environment resulting in a physical, chemical or biological change in a pristine water body be of a temporary nature, such that by natural processes, within a few hours, days or weeks, the aquatic ecosystem will return to a state functionally identical to the original." S.Rep. No. 414, 92d Cong., 2d Sess. 76 (1971), reprinted in 1972 U.S.Code Cong. & Admin.News 3668, 3742.

The 1972 Amendments established a fundamentally different approach to water pollution prevention and abatement. Rather than relying upon ambient water quality as the measure of compliance, the 1972 Act established effluent limitations with respect to all "point sources" of pollution.[f] Pub.L. No. 92–

---

f. The 1972 Amendments define a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete

500, Section 301, 86 Stat. 816, 844–845. Thus, the 1972 Act focused on the substances discharged rather than the ability of the receiving stream to ameliorate their effects.[g] The effluent limitations were imposed as conditions in the National Pollutant Discharge Elimination System ("NPDES") permits. *Natural Resources Defense Council v. Costle* (C.A.D.C.1977), 568 F.2d 1369, 1374; *State ex rel. Brown v. Dayton Malleable, Inc.* (1982), 1 Ohio St.3d 151, 1 OBR 185, 438 N.E.2d 120. Consequently, a discharge within the permit's limitations amounted to an exception to the general proscription against the discharge of pollutants.[h]

---

fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." Pub.L. No. 92–500, Section 502(14), 86 Stat. 816, 887, codified in part at Section 1362(14), Title 33, U.S.Code.

**g.** The effluent limitations were instituted, in large part, because water quality standards were difficult to administer and of limited success. In explaining the thrust of the 1972 Amendments, the Senate Committee report stated:

"The legislation recommended by the Committee proposes a major change in the enforcement mechanism of the Federal water pollution control program from water quality standards to effluent limits.

"Under the 1965 Act, water quality standards were to be set as the control mechanism. States were to decide the uses of water to be protected, the kinds and amounts of pollutants to be permitted, the degree of pollution abatement to be required, the time to be allowed a polluter for abatement.

"The water quality standards program is limited in its success. After five years, many States do not have approved standards. Officials are still working to establish relationships between pollutants and water uses. Time schedules for abatement are slipping away because of failure to enforce, lack of effluent controls, and disputes over Federal–State standards.

"*The Committee adopted this substantial change because of the great difficulty associated with establishing reliable and enforceable precise effluent limitations on the basis of a given stream quality. Water quality standards, in addition to their deficiencies in relying on the assimilative capacity of receiving waters, often cannot be translated into effluent limitations—defendable in court tests, because of the imprecision of models for water quality and the effects of effluents in most waters.*

"Under this Act the basis of pollution prevention and elimination will be application of effluent limitations. Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement.

"*The Committee recommends the change to effluent limits as the best available mechanism to control water pollution. With effluent limits*, the Administrator can require the best control technology; *he need not search for a precise link between pollution and water quality.*" (Emphasis added.) S.Rep. No. 414, 92d Cong., 2d Sess. 8, reprinted in 1972 U.S.Code Cong. & Admin.News 3668, 3675.

**h.** The exception was born of necessity. As noted in the Senate Committee Report:

"This section [now codified at Section 1311(a), Title 33, U.S.Code] clearly establishes that the discharge of pollutants is unlawful. Unlike its predecessor program which permitted the discharge of certain amounts of pollutants under the conditions described above, this legislation would clearly establish that no one has the right to pollute—*that pollution continues because of technological limits, not because of any inherent right to use the nation's waterways for*

Compliance with these effluent limitations was envisioned to be a product of both statutory deadlines and technological advancement. The effluent limitations are set on an industry-by-industry basis and are predicated upon the pollution reduction achievable through specified levels of technology. Pub.L. No. 92–500, Sections 301(b), 304(b) and 306(a), 86 Stat. 816, 844–845, 851, 854–855; see, currently, Sections 1311(b), 1314(b) and 1316(a), Title 33, U.S.Code; *Natural Resources Defense Council v. United States Environmental Protection Agency* (C.A.D.C.1987), 822 F.2d 104, 110. The increasingly stringent effluent limitations prescribed for successive compliance dates were designed to promote the development of better technology for eliminating pollutants.[i] The 1972 Amendments initially established three levels of technology for private industrial point sources. Section 301(b)(1)(A) of the Act, Section 1311(b)(1)(A), Title 33, U.S.Code, prescribed that existing sources of water pollution achieve effluent limitations obtainable through the best practicable control technology currently available ("BPTCA") not later than July 1, 1977. Section 304(b)(1)(B) of the Act, Section 1314(b)(1)(B), Title 33, U.S.Code, states that the Administrator of the USEPA, in considering what constitutes BPTCA, must consider "the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate[.]"

In this respect:

" *'The term "total cost of application of technology" as used in section 304(b)(1)(B) is meant to include those internal, or plant, costs sustained by the owner or operator* and those external costs such as potential unemployment, dislocation, and rural area economic development sustained by the community, area, or region.' " (Emphasis added.) Congressional Research Service, A Legislative History of the Water Pollution Control Act Amend-

---

*the purpose of disposing of wastes."* (Emphasis added.) S.Rep. No. 414, 92d Cong., 2d Sess. 76 (1971), reprinted in 1972 U.S.Code Cong. & Admin.News 3668, 3709.

i. In a sense, this approach applies to environmental protection efforts the maxim that "necessity is the mother of invention." See S.Rep. No. 414, 92d Cong., 2d Sess. 76 (1971), reprinted in 1972 U.S.Code Cong. & Admin.News 3668, 3798. See, also, *Chemical Manufacturers Assn. v. Natural Resources Defense Council* (1985), 470 U.S. 116, 155–156, 105 S.Ct. 1102, 1123, 84 L.Ed.2d 90, 117 (Marshall, J., dissenting); Van Putten & Jackson, *supra,* 19 U.Mich.J.L.Ref. at 889–890, and at fn. 118.

ments of 1972 (Comm.Print 1973), at 231–232, quoted in *Am. Frozen Food Inst. v. Train, supra,* 539 F.2d at 121.

Generally, the BPTCA limitations require the implementation of technologies which "represent the average of the best levels of performance by existing plants of various sizes, ages, and unit processes within the category or subcategory for control of conventional pollutants." *Chemical Manufacturers Assn. v. United States Environmental Protection Agency* (C.A.5, 1989), 870 F.2d 177, 203. See, also, *E.I. du Pont de Nemours & Co. v. Train* (1977), 430 U.S. 112, 131, 97 S.Ct. 965, 976, 51 L.Ed.2d 204, 219, fn. 21.

The BPTCA standard is the minimum level of technology required of point sources under the Act. *Am. Iron & Steel Inst. v. United States Environmental Protection Agency* (C.A.3, 1975), 526 F.2d 1027, 1057; *Am. Paper Inst. v. Train* (C.A.D.C.1976), 543 F.2d 328, 334.

Section 301(b)(2)(A) of the Act, codified in part at Section 1311(b)(2)(A), Title 33, U.S.Code, prescribed that existing sources of water pollution achieve effluent limitations obtainable through the employment of the best available technology economically achievable ("BATEA") not later than July 1, 1983. Section 304(b)(2)(B) of the Act, Section 1314(b)(2)(B), Title 33, U.S.Code, directs the Administrator to determine BATEA by considering factors which "take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate[.]"

In contrast to the BPTCA standard, the BATEA standard requires that level of pollution reduction achieved by "the best performer in an industrial category." *Chemical Manufacturers Assn. v. Natural Resources Defense Council* (1985), 470 U.S. 116, 155, 105 S.Ct. 1102, 1123, 84 L.Ed.2d 90, 117 (Marshall, J., dissenting). See, also, *Am. Frozen Food Inst. v. Train, supra,* 539 F.2d at 119.

With respect to the costs of compliance, the BATEA standard likewise differs from that applicable to BPTCA. Unlike BPTCA, the costs associated with BATEA do not depend upon the financial ability of the individual discharger to comply but rather upon the financial ability of the industry in general.[j]

---

j. Thus, the Conference Report to the 1972 Amendments provides in relevant part:

   " 'In determining the "best available technology" for a particular category or class of point sources, the Administrator is directed to consider the cost of achieving effluent reduction. *The Conferees intend that the factors described in section 304(b) be considered only within*

120

The 1972 Amendments further established technological requirements for "new sources" of pollution.[k] Section 306(a)(1) of the Act, Section 1316(a)(1), Title 33, U.S.Code, furnishes guidelines for the development of new source performance standards for particular industrial processes. It provides:

"The term 'standard of performance' means a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which the Administrator determines to be *achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants.*" (Emphasis added.)

As is evident from the plain language of Section 306(a)(1), the "best available demonstrated control technology" ("BADCT") standard required the greatest degree of effluent reduction technologically feasible. *E.I. du Pont de Nemours & Co. v. Train, supra*, 430 U.S. at 120–121, 97 S.Ct. at 971, 51 L.Ed.2d at 213. It therefore establishes a level of technology which differs significantly from the BPTCA and BATEA standards applicable to existing sources of pollution. *Id.* This view is underscored by the enactment by Congress of a separate section of the 1972 Amendments (*i.e.*, Section 306) dealing specifically with new pollution sources. As one court has observed:

"Intuitively, there is some force to the observation that Congress would not have devised a completely new statutory scheme for regulation of new sources if it intended that the effluent standards for such plants would be identical to those required for existing sources." *Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra*, 870 F.2d at 263.

The BADCT standard is the most stringent level of pollution control technology mandated by the Act. *Am. Paper Inst. v. Train, supra*, 543 F.2d at 334; *Am. Iron & Steel Inst. v. United States Environmental Protection Agency, supra*, 526 F.2d at 1059. The imposition of more exacting technologi-

---

classes or categories of point sources and that such factors not be considered at the time of the application of an effluent limitation to an individual point source within such a category or class.'" (Emphasis added.) Congressional Research Service, A Legislative History of the Water Pollution Control Act Amendments of 1972 (Comm.Print 1973), at 171–172, as quoted in *Am. Frozen Food Inst. v. Train, supra*, 539 F.2d at 120.

k. A "new source" is defined in Section 306(a)(2) of the 1972 Act, Section 1316(a)(2), Title 33, U.S.Code, as follows:

"The term 'new source' means any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section."

cal requirements on new sources of pollution is not difficult to understand. The goal of the 1972 Amendments was to progressively reduce the amount of pollutants entering the waterways of the nation. In furtherance of this goal, " * *, * Congress was clearly appreciative of the fact that the most effective and least expensive approach to water pollution would be to prevent new water pollution problems by requiring 'maximum feasible control of new sources, at the time of their construction.' Thus, Congress recognized that new sources could attain discharge levels more easily and at less cost than existing sources which must be retrofitted." (Footnote omitted.) *Am. Iron & Steel Inst. v. United States Environmental Protection Agency, supra,* 526 F.2d at 1058. See, also, *Am. Paper Inst. v. Train, supra,* 543 F.2d at 354.

Because of the advantages of addressing pollution control requirements at the design stage, the cost of compliance becomes less of a factor in establishing the technology for a new source of pollution.[l] Moreover, the BADCT standard proceeds from a point of reference different from that applicable to BPTCA and BATEA. Unlike the latter standards, the BADCT standard is not governed by the best performer (BATEA) or the average of the best performers (BPTCA) in an industrial category. Rather, it represents innovative technology on the forefront of science and engineering. It is apparent from the legislative history of the 1972 Amendments that the term "demonstrated technology" was not intended by Congress to restrict agency consideration to those processes which are currently in wide use in the relevant industry. *Am. Iron & Steel Inst. v. United States Environmental Protection Agency, supra,* 526 F.2d at 1058. Rather, appropriate processes demonstrated by a pilot project or "transfer technology" successfully employed in another industry may establish the relevant BADCT standard.[m]

Section 306(b)(1)(A) of the 1972 Act, Section 1316(b)(1)(A), Title 33, U.S.Code, identifies the industries for which the Administrator is to develop standards of performance. Among the standards developed for particular industries were effluent limitations for conventional pollutants. See, *e.g., Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra,* 870

---

[l]. See *Chemical Manufacturers Assn. v. United States Environmental Protection Agency, supra,* 870 F.2d at 196; *Am. Iron & Steel Inst. v. United States Environmental Protection Agency, supra,* 526 F.2d at 1058. The cost of compliance would appear to be less of a factor in the BATEA context as well. See *Am. Paper Inst. v. Train, supra,* 543 F.2d at 338–339.

[m]. Transfer technology has been described as "technology which has been developed in one process or industry but which the Administrator believes can be successfully 'transferred' to other processes or industries which operate under similar conditions." *Am. Iron & Steel Inst. v. United States Environmental Protection Agency, supra,* 526 F.2d at 1059, fn. 72a.

F.2d at 261–262; *Reynolds Metals Co. v. United States Environmental Protection Agency* (C.A.4, 1985), 760 F.2d 549, 557.

In addition to the standards established for private industrial dischargers, Sections 301(b)(1)(B) and (C) of the 1972 Act, Sections 1311(b)(1)(B) and (C), Title 33, U.S.Code, prescribe effluent limitations for publicly owned treatment works ("POTWs"). These sections provide:

"In order to carry out the objective of this Act there shall be achieved—

"* * *

"(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 203 of this Act prior to June 30, 1974 (for which construction must be completed within four years of approval), *effluent limitations based upon secondary treatment* as defined by the Administrator pursuant to section 304(d)(1) of this Act; *or,*

"(C) *not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards,* treatment standards, or schedules of compliance, *established pursuant to any State law or regulations* (under authority preserved by section 510) *or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this Act."* (Emphasis added.)

Thus, in contradistinction to private point sources, POTWs are generally required to meet the level of effluent reduction achievable through the use of "secondary treatment" technologies.[n] This technological standard is tantamount to the BPTCA standard. See Congressional Research Service, A Legislative History of the Water Pollution Control Act Amendments of 1972 (Comm.Print 1973), at 169–170, cited in *Am. Frozen Food Inst. v. Train, supra,* 539 F.2d at 119.

The technology-based standards prescribed by the 1972 Amendments create nationally uniform obligations independent of any applicable water quality criteria. See *Consolidation Coal Co. v. Costle* (C.A.4, 1979), 604 F.2d 239, 245, reversed on other grounds *sub nom. United States Environmental Protection Agency v. Natl. Crushed Stone Assn.* (1980), 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268. See, also, Pedersen, *supra,* 15 Ecology L.Q. at 76, fn. 36.

---

n. "Secondary treatment" refers to "a physical/biological process for removing solids and pollutants characterized by biological oxygen demand and pH." *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency* (C.A.3, 1986), 790 F.2d 289, 293, fn. 2. Federal secondary treatment standards have been prescribed by the United States Environmental Protection Agency at Part 133, Title 40, C.F.R.

Water quality standards nevertheless remain an integral component of the comprehensive approach to water pollution control taken by the 1972 Amendments. The concept of technological controls came largely from Senate revisions to prior law. See Gaba, *supra,* 36 Vand.L.Rev. at 1183. A contrary view prevailed in the House of Representatives, which favored retention of the water-quality-based standards of the 1948 and 1965 Acts. *Id.* at 1184. What emerged from the Conference Committee considering the 1972 Amendments was the incorporation of both technology-based and water-quality-based approaches. *Id.* at 1185. Far from supplanting the effluent limitations, the water quality standards were designed to supplement them. See *United States Environmental Protection Agency v. California ex rel. State Water Resources Bd.* (1976), 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578, 583, fn. 12; *Oklahoma v. United States Environmental Protection Agency* (C.A.10, 1990), 908 F.2d 595, 605, fn. 7, reversed on other grounds *sub nom. Arkansas v. Oklahoma* (1992), 503 U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239.

Accordingly, the technology-based requirements applicable to a particular point source constitute the minimum level of effluent reduction required. See, generally, Van Putten & Jackson, *supra,* 19 U.Mich.J.L.Ref. at 880. Where the nationally uniform technological standards are insufficient to meet applicable water quality criteria, additional controls must be employed. See *Arkansas v. Oklahoma, supra,* 503 U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239; *Natural Resources Defense Council v. United States Environmental Protection Agency* (C.A.9, 1990), 915 F.2d 1314, 1317. Section 303(a) of the 1972 Act, Section 1313(a), Title 33, U.S. Code, directs the states to adopt water quality standards, provides for federal review of the standards and authorizes the Administrator to adopt standards where the state has failed to comply.

The Act "divides water quality standards into uses and criteria. 'Uses' are the functions—such as recreation, irrigation, or provision of wildlife habitat— that the state has assigned a given body of water. 'Criteria' are the technical judgments as to the specific pollution levels that are compatible with those uses." Pedersen, *supra,* 15 Ecology L.Q. at 92–93.

Water quality criteria generally assume three forms. The criteria may be expressed in numerical terms reflecting the maximum permissible concentration of a particular pollutant in the receiving water. The criteria may be expressed in terms of bioassay results which reflect mortality rates of certain water-borne organisms relative to the concentration levels of particular pollutants. Finally, the criteria may be narrative in nature and limit, for example, the concentrations of discharged substances to a level below that which produces adverse effects in humans, animals or plants. See Gaba, *supra,* 36 Vand.L.Rev. at 1205.

124

The 1972 Act also authorizes the Administrator to prescribe site-specific technological requirements for particular point sources. This generally occurs when no national technological standard has been promulgated for the industrial process in question, see Section 401(a)(1) of the 1972 Act, Section 1341(a)(1), Title 33, U.S. Code, or where a national technological standard is insufficient to meet water quality requirements. See Section 301(b)(1)(C) of the 1972 Act, Section 1311(b)(1)(C), Title 33, U.S. Code. Under such circumstances, the Administrator (or the state regulatory agency) may incorporate conditions into the NPDES permit which prescribe site-specific technological controls. The requirements incorporated into the permit are to represent the best professional judgment of the person whose responsibility it is to tailor the technological requirements to site-specific conditions. See *Natural Resources Defense Council v. United States Environmental Protection Agency* (C.A.D.C.1988), 859 F.2d 156, 195; Van Putten & Jackson, *supra*, 19 U.Mich. J.L.Ref. at 877, fn. 59, and at 882–883, fn. 86.

The 1972 Amendments also provided financial assistance to POTWs for construction of areawide treatment facilities. Section 201(a) of the Act, Section 1281(a), Title 33, U.S. Code, sets forth the purpose behind the construction grant program established by the 1972 Amendments. It provides:

"It is the purpose of this title to require and to assist the development and implementation of waste treatment management plans and practices which will achieve the goals of this Act."

Section 201(c) of the Act, Section 1281(c), Title 33, U.S. Code, provides further:

"To the extent practicable, waste treatment management shall be on an areawide basis and provide control or treatment of all point and nonpoint sources of pollution, including in place or accumulated pollution sources."

Section 201(g)(1) of the Act, Section 1281(g)(1), Title 33, U.S. Code, authorizes the Administrator to award grants "to any State, municipality, or intermunicipal or interstate agency for the construction of publicly owned treatment works." The amount of these grants was then set at seventy-five percent of the construction cost. See Section 202(a) of the Act, Section 1282(a)(1), Title 33, U.S. Code. Section 204(a)(1) of the Act, now codified as amended at Section 1284(a)(1), Title 33, U.S. Code, conditions grants upon compliance with any required areawide waste treatment management plan developed pursuant to Section 208 of the Act. Section 207 of the Act, Section 1287, Title 33, U.S. Code, authorized initial appropriations for the construction grant program of up to $5 billion for fiscal year 1973, up to $6 billion for fiscal year 1974 and up to $7 billion for fiscal year 1975.

Section 208 of the Act, Section 1288, Title 33, U.S. Code, promotes the development of areawide waste treatment management plans. Subsections 208(b)(1) and (b)(2)(C)(i), Sections 1288(b)(1)(A) and (b)(2)(C)(i), Title 33, U.S. Code, require that any planning conducted pursuant thereto shall be consistent with Section 201. Section 208(c)(1), Section 1288(c)(1), Title 33, U.S. Code, directs the governor of each state to designate areawide management agencies to plan, develop, administer and construct centralized wastewater treatment facilities.

Appellee city of Columbus has been designated the areawide waste treatment management agency for the region in which the JWSD and Lionmark plants would be sited. Section 208(d) of the 1972 Act, Section 1288(d), Title 33, U.S. Code, restricts grants available under Section 201(g)(1) to those facilities which conform to a Section 208 plan. Moreover, Section 208(f)(2), Section 1288(f)(2), Title 33, U.S. Code, provided for federal funding of all of the cost of the planning process for fiscal years 1973, 1974 and 1975, and up to seventy-five percent thereafter. Finally, Section 208(f)(3), Section 1288(f)(3), Title 33, U.S. Code, authorized initial appropriations of up to $50 million for fiscal year 1973, up to $100 million for fiscal year 1974 and $150 million for fiscal year 1975.

On March 11, 1974, pursuant to Section 402(b) of the 1972 Act, Section 1342(b), Title 33, U.S. Code, the OEPA was authorized to administer the NPDES permit program within the state. 39 F.R. 26061. On July 10, 1975, the USEPA proposed rules for preparing state water quality management plans. The rules required that states incorporate within these plans an antidegradation policy consistent with the policy announced by the Department of the Interior.[o] After public comment and modification by the agency,

---

o. The proposed rule, Section 130.10, Title 40, C.F.R., provided:
"(a) The State shall prepare a planning process which shall provide for:
" * * *
"(4) The development, review and adoption of water quality standards in accordance with Section[s] 303(c)(1) and (2) of the Act; [and]
"(5) The development and implementation of a Statewide policy on antidegradation, consistent with the criteria identified in § 131.11(e) of this chapter[.]"  40 F.R. 29884.
The requirements for a state plan enumerated above were set forth in the conjunctive. Thus, the antidegradation standard was independent of water quality standards based on designated uses.
Proposed Section 131.11(e), Title 40, C.F.R., provided:
"The following elements shall be included in each State water quality management plan:
" * * *
"(e) Water quality standards. (1) The applicable water quality standards established pursuant to Section[s] 303(a) through (c) of the Act and recommendations for revision of water quality standards applicable to each body of water. The recommendations for revision of water quality standards shall be consistent with the following:

the rule was adopted on November 21, 1975.ᵖ  40 F.R. 55336.  The rule in its

"(i) Water quality standards shall specify appropriate beneficial water uses to be achieved or protected and the water quality criteria necessary to support those appropriate beneficial uses;
" * * *

"(2) *The Statewide antidegradation policy and the methods for implementing such policy,* established pursuant to § 130.10(a)(5) of this chapter.  *The antidegradation policy and implementation methods shall be consistent with the following:*

"(i) *Existing in-stream beneficial water uses shall be maintained and protected.  No further water quality degradation which would result in impairment of existing in-stream beneficial uses is allowable.*

"(ii) *Existing high quality waters which exceed those levels necessary to support propagation of fish, shellfish and wildlife and recreation in and on the water shall be maintained and protected unless the State chooses,* after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process and subject to the provisions of § 131.11(e)(2)(i) of this part, *to allow lower water quality as a result of necessary and justifiable economic or social development.  In such cases, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources* and feasible management or regulatory programs pursuant to Section 208 of the Act for nonpoint sources, both existing and proposed.

"(iii) *Determinations under § 131.11(e)(2)(ii) shall not be subject to disapproval by the Administrator* (except where regulatory or statutory requirements have not been satisfied), *except for any water quality impairment which affects waters or water uses protected by Federal statute (e.g., the National Park System; Wild and Scenic Rivers, Endangered Species, etc.)."*  (Emphasis added.)  40 F.R. 29889.

Thus, this section likewise differentiated between general water quality standards associated with beneficial uses and the antidegradation policy.

It also demonstrated greater federal concern for particular categories of high quality waters (*i.e.,* those within national parks, those constituting wild and scenic rivers and those which support endangered species).

**p.**  Section 130.10, Title 40, C.F.R. provided in relevant part:

"(b) In addition to the requirements of § 130.10(a), the State agency planning process shall provide for the following:

"(1) The development, review and adoption of water quality standards in accordance with § 130.17(a) and with section[s] 3(c)(1) and (2) of the Act;

"(2) *The development, adoption and implementation of a Statewide policy on antidegradation, consistent with the criteria identified in § 130.17(d);*
" * * *

"(c) The description of the State planning process that is to be submitted by the Governor pursuant to § 130.40(b) shall contain, as a minimum, the following:
" * * *

"(5) A schedule for review and revision, where necessary, *of water quality standards and for development and adoption of a Statewide policy on antidegradation,* together with a schedule of milestones which includes proposed dates for public hearings on the revisions and antidegradation policy.  The schedule shall provide that the water quality standards and the antidegradation policy will be reviewed and revised in ample time to be used as a basis for 1977–1983 management and regulatory decisions."  (Emphasis added.)  40 F.R. 55338.

Moreover, Section 130.17, Title 40, C.F.R. provided in relevant part:

"(a) The State shall hold public hearings for the purpose of reviewing water quality standards and shall adopt revisions to water quality standards, as appropriate, at least once

final form was significant in two important respects. It retained the distinction between the preservation of existing water quality and protection of existing beneficial uses. Second, the rule expanded the categories of high quality waters meriting special protection to include those within state parks and national parks and preserves, or waters designated as scenic rivers.

every three years and submit such revisions to the appropriate Regional Administrator pursuant to section 303(c) of the Act.

"(b) The water quality standards of the State shall:

"(1) Protect the public health or welfare, enhance the quality of water and serve the purposes of the Act;

"(2) *Specify appropriate water uses to be achieved and protected,* taking into consideration the use and value of water for public water supplies, propagation of fish, shellfish, and wildlife, recreation purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation; and

"(3) *Specify appropriate water quality criteria necessary to support those water uses designated pursuant to § 130.17(b)(2).*

"(c) In reviewing and revising its water quality standards pursuant to § 130.17(a), the State shall adhere [to] the following principles:

"* * * *

"(2) *The State shall maintain those water uses which are currently being attained.* Where existing water quality standards specify designated water uses less than those which are presently being achieved, the State shall upgrade its standards to reflect the uses actually being attained.

"* * * *

"(4) The State shall take into consideration the water quality standards of downstream waters and shall assure that its water quality standards provide for the attainment of the water quality standards of downstream waters.

"* * * *

"(e) *The State shall develop and adopt a Statewide antidegradation policy and identify the methods for implementing such policy pursuant to § 130.10(b)(2). The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following*:

"(1) Existing instream water uses shall be maintained and protected. No further water quality degradation which would interfere with or become injurious to existing instream water uses is allowable.

"(2) *Existing high quality waters which exceed those levels necessary to support propagation of fish, shellfish and wildlife and recreation in and on the water shall be maintained and protected unless the State chooses,* after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, *to allow lower water quality as a result of necessary and justifiable economic or soical delevolpment [sic]. In no event, however, may degradation of water quality interfere with or become injurious to existing instream water uses. Additionally, no degradation shall be allowed in high quality waters which constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance. Further the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources* and feasible management or regulatory programs pursuant to section 208 of the Act for nonpoint sources, both existing and proposed." (Emphasis added.) 40 F.R. 55340–55341.

On December 27, 1977, the Federal Water Pollution Control Act was again amended.[q] Pub.L. No. 95–217, 91 Stat. 1566. New subparagraph (E) was added to Section 301(b)(2) of the 1972 Act, Section 1311(b)(2)(E), Title 33, U.S. Code, as amended, to provide that point sources other than POTWs were to employ best conventional pollutant control technology ("BCT") to remove certain substances from effluent. These substances were identified as conventional pollutants in new subsection 304(a)(4) of the Act, Section 1314(a)(4), Title 33, U.S. Code, and encompassed "pollutants classified as biological oxygen demanding, suspended solids, fecal coliform and pH." Moreover, the 1977 Amendments established July 1, 1984 as the deadline for compliance by private point sources with the BCT standard. See Section 301(b)(2)(E) of the 1977 Act, Section 1311(b)(2)(E), Title 33, U.S. Code. The BCT standard supplants the BATEA standard with respect to conventional pollutants. *United ed States Environmental Protection Agency v. Natl. Crushed Stone Assn., supra*, 449 U.S. at 70, 101 S.Ct. at 300, 66 L.Ed.2d at 275, fn. 9.

Effective July 25, 1980, R.C. 6111.041 was enacted in its present version. It provides in relevant part:

"In furtherance of sections 6111.01 to 6111.08 of the Revised Code, the director of environmental protection shall adopt standards of water quality to be applicable to the waters of the state. Such standards shall be adopted pursuant to a schedule established, and from time to time amended, by the director, to apply to the various waters of the state, in accordance with Chapter 119. of the Revised Code. *Such standards shall be adopted in accordance with section 303 of the 'Federal Water Pollution Control Act' and shall be designed to* improve and *maintain the quality of such waters for the purpose of protecting the public health and welfare, and to enable the present and planned use of such waters* for public water supplies, industrial and agricultural needs, propagation of fish, aquatic life, and wildlife, and recreational purposes." (Emphasis added.)

---

q. The 1977 Amendments to the Act provided alternate titles for the revised law. The preamble to the legislation referred to it as the "Clean Water Act of 1977." However, Section 518 of the Act was amended to read that "[t]his Act may be cited as the 'Federal Water Pollution Control Act' (commonly referred to as the Clean Water Act)." 91 Stat. 1566. Apparently, the dual titles were the result of an impasse between the Senate, which favored the new title, and the House of Representatives, which favored retention of the former description of the Act. See Gaba, *supra*, 36 Vand.L.Rev. at 1168, fn. 3; Van Putten & Jackson, *supra*, 19 U.Mich.J.L.Ref. at 863, fn. 1. For purposes of clarity, we will refer to the 1977 legislation as the Clean Water Act.

On November 2, 1983, the USEPA promulgated the current version of the federal antidegradation standard. 48 F.R. 51407. Recodified at Section 131.12, Title 40, C.F.R., it provides in relevant part:

"(a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

"(1) *Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.*

"(2) *Where the quality of the waters exceed[s] levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds,* after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, *that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources* and all cost-effective and reasonable best management practices for nonpoint source control.

"(3) *Where high quality waters constitute an outstanding National resource, such as waters of National and State parks* and wildlife refuges and waters of exceptional recreational or ecological significance, *that water quality shall be maintained and protected."* (Emphasis added.)

This provision differs in many important respects from the rule originally proposed by the agency. First, the USEPA had proposed to limit the antidegradation policy to the protection of existing uses. After public comment, this proposal was rejected and the agency retained the language of former Section 131.12, Title 40, C.F.R., protecting both uses and water quality. See 48 F.R. 51402. Second, the agency amended Section 131.12(a)(2), Title 40, C.F.R. to provide that, where the state has allowed existing water quality to degrade, it must ensure that the remaining quality is sufficient "to protect existing uses fully." The agency commented that:

"This means that the full use must continue to exist even if some change in water quality may be permitted." 48 F.R. 51403.

Third, the agency had proposed that the states be authorized to allow limited degradation of high quality waters when necessary to accommodate *"significant* economic or social development." (Emphasis added.) The rule

as adopted changed "significant" to "important." The agency explained the change as follows:

"In the context of the antidegradation policy the word 'important' strengthens the intent of protecting higher quality waters. Although common usage of the words may imply otherwise, the correct definitions of the two terms indicate that the greater degree of environmental protection is afforded by the word 'important.'" 48 F.R. 51403.

Finally, USEPA clarified Section 131.12(a)(3), Title 40, C.F.R. The agency remarked that:

"* * * § 131.12(a)(3) dealing with the designation of outstanding National resource waters (ONRW) was changed to provide a limited exception to the absolute 'no degradation' requirement. EPA was concerned that waters which properly could have been designated as ONRW were not being so designated because of the flat no degradation provision, and therefore were not being given special protection. The no degradation provision was sometimes interpreted as prohibiting *any* activity (including temporary or short-term) from being conducted. States may allow some limited activities which result in temporary and short-term changes in water quality. Such activities are considered to be consistent with the intent and purpose of an ONRW. Therefore, EPA has rewritten the provision to read '* * * that water quality shall be maintained and protected,' and removed the phrase 'No degradation shall be allowed * * *.'" (Emphasis *sic*.) 48 F.R. 51403.

The agency's departure from the proposed rule significantly strengthened it. The reference to protecting existing uses fully where limited water quality degradation is permitted underscores the distinction between preservation of existing water quality and protection of existing uses. Plainly, these are not synonymous concepts to the federal agency which drafted the rule.[r] Second, the substitution of the word "important" for the word "significant" evinces an intent that degradation is not to be casually allowed. Finally, the discussion of outstanding national resource waters ("ONRW") clearly discloses the

---

r. The USEPA further articulated this view in a guidance document prepared to assist in abating nonpoint water pollution. The agency observed that water quality standards are defined as numerical and narrative criteria, the antidegradation policy, and designated uses. See USEPA, Revised Program Guidance Memorandum: SAM–32 (Nov. 14, 1978), cited in Anderson, Water Quality Planning for the National Forests (1987), 17 Envtl.L. 591, 605–606. It is apparent from this reference that, since the antidegradation policy was incorporated into the agency's rules, it constituted a standard separate and apart from water quality criteria and use designations. Indeed, it has been observed that the decision to degrade constitutes a revision of an operative water quality standard requiring USEPA approval under Section 303(C)(2) of the 1972 Amendments. See Hines, *supra,* 62 Iowa L.Rev. at 680.

agency's intent to prohibit *any* degradation of ONRW which is not temporary. See Anderson, Water Quality Planning for the National Forests (1987), 17 Envtl.L. 591, 620–621.

Despite this regulatory history, it has been urged that "degradation" means only deterioration of water quality below a level protective of an existing use. Courts and commentators have rejected this argument. See *Oklahoma v. United States Environmental Protection Agency, supra,* 908 F.2d at 618; Gaba, *supra,* 36 Vand.L.R. at 1192–1193; Note, *supra,* 50 Notre Dame Law. at 900, fn. 82. This consensus is largely a product of the legislative history of the Clean Water Act and the actions taken by the USEPA to enforce the policy. See, *e.g., West Virginia Coal Assn. v. Reilly* (S.D.W.Va.1989), 728 F.Supp. 1276, 1290; Van Putten & Jackson, *supra,* 19 U.Mich.J.L.Ref. at 893, fn. 127. Given this legislative and administrative background, the federal antidegradation regulation has been concisely summarized as follows:

"First, all existing uses and the level of water quality necessary to protect those uses must be maintained. This tier established the 'absolute floor' of water quality in all waters in the United States. The second tier provides protection of actual water quality in areas where the quality exceeds levels necessary to support the existing uses. States may allow exceptions for limited degradation of these 'high quality waters' after extensive public involvement, as long as existing uses are fully protected. The third and highest level of protection is for waters that the states designate as 'Outstanding National Resource Waters' (ONRW). Only 'temporary and short-term changes' in water quality are permitted in ONRW." Anderson, *supra,* 17 Envtl.L. at 620–621.

In addition to incorporating a national antidegradation policy into USEPA regulations, Section 131.6, Title 40, C.F.R. also explicitly prescribes minimum requirements for state water quality standards. In particular, Section 131.6 provides:

"The following elements must be included in each State's water quality standards submitted to EPA for review:

" * * *

"(d) An antidegradation policy consistent with § 131.12."