**[Cite as *Mocznianski v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-1161.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Terrence Mocznianski, Guardian on
behalf of Krista Mocznianski

        Appellant

v.

Ohio Department of Job and
Family Services

        Appellee

Court of Appeals No. L-19-1076

Trial Court No. CI0201804194

**DECISION AND JUDGMENT**

Decided:  March 27, 2020

* * * * *

Shakeba DuBose, for appellant.

Dave Yost, Ohio Attorney General, and Justin T. Radic,
Senior Assistant Attorney General, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Kristina Mocznianski, through her brother and guardian, Terrence

Mocznianski, appeals the March 25, 2019 judgment of the Lucas County Court of

Common Pleas that overruled her appeal of a decision by appellee, the Ohio Department

of Job and Family Services ("JFS"), that limited the number of hours of homemaker personal care ("HPC") services that Terrence could provide for Kristina. For the following reasons, we affirm.

## I. Background

{¶ 2} On May 21, 2018, the Lucas County Board of Developmental Disabilities ("BODD") sent Kristina a Medicaid due process notice[1] informing her that Terrence would be limited to providing her 60 hours per week of HPC services, effective May 18, 2018. The notice did not change the total HPC services hours—112 per week—to which Kristina was entitled; it simply reduced the number of hours that Terrence could provide from 112 to 60, with the remaining 52 hours per week to come from "another DD provider(s)." The notice cited "Independent Provider Rule 5123:2-9-03" as the reason for the change. Subject to a few exceptions, the rule—Ohio Adm.Code 5123:2-9-03— limits the time any single "independent provider" performing "any medicaid-funded services" can work to 60 hours per week, effective February 1, 2018.

{¶ 3} On May 25, 2018, Kristina, through Terrence, requested a state hearing with JFS regarding the proposed change to Kristina's services. She claimed that her compromised immune system or low white blood cell ("WBC") count—caused by

---

[1] BODD initially provided Kristina with two Medicaid due process notices on April 13, 2018. One notice approved Kristina's request for HPC services, and one purported to reduce Kristina's HPC services "from 112 hours per week with Terrence to 60 hours per week with Terrence * * *." BODD later withdrew the April 13 notices and replaced them with the May 21 notice. Thus, the April 13 notices are not at issue in this appeal.

2.

leukopenia—entitled her to have only one HPC services provider. JFS held the state hearing on August 8, 2018.[2]

{¶ 4} In a September 14, 2018 decision, the state hearing officer overruled the appeal, finding that BODD properly limited the hours of HPC services that Terrence could provide based on the restriction in Ohio Adm.Code 5123:2-9-03 capping the number of hours a provider could work each week. The hearing officer concluded that the medical evidence presented at the hearing did not support a finding that Kristina's "low normal white blood cell count [was] something that would prohibit her form [sic] having three providers who work in concert to care for her." The hearing officer also found that Kristina's situation did not meet the "emergency" exception to the overtime rule in Ohio Adm.Code 5123:2-9-03(D)(1).

{¶ 5} On September 25, 2018, Kristina, through Terrence, sought an administrative appeal of the state hearing officer's decision. On September 28, 2018, JFS affirmed the state hearing officer's decision. After reviewing the evidence presented at the state hearing, the JFS appellate panel upheld the hearing officer's decision because "[Kristina's] brother at the state hearing indicated he did not object to additional providers and the slightly below normal white blood cell count could be addressed by proper protection procedures such as gloves, masks, etc."

---

[2] The administrative record in this case does not contain a transcript of the state hearing.

3.

**{¶ 6}** On October 26, 2018, Kristina, through Terrence, appealed to the common pleas court. On March 25, 2019, the court affirmed the state hearing officer's and JFS's decisions to overrule Kristina's appeal. After reviewing the administrative record, the court determined that there was "reliable, probative and substantial evidence in the record that Kristina would not be put at risk by having additional providers."

**{¶ 7}** Kristina, through Terrence, now appeals, raising two assignments of error:

First Assignment of Error: The court erred in trial court erred in its interpretation of O.A.C. 5123:2-9-03(D)(3)(a)(iii).

Second Assignment of Error[:] The lower court erred in finding there is reliable, probative and substantial evidence in the record that Kristina would not be put at risk by having additional providers.

## II. Facts

**{¶ 8}** Kristina is a profoundly disabled adult who has, among other issues, Down syndrome, dementia, seizure disorder, autism, and leukopenia. Most relevant to this case is the leukopenia, which causes a decrease in the number of WBCs in a person's blood. Due to her disabilities, Kristina is unable to independently care for herself and requires assistance with all activities of daily living, including feeding, dressing, bathing, and toileting. Kristina is eligible, through the Medicaid individual options waiver program, for 112 hours per week of HPC services to assist her with the activities of daily living that she is unable to perform. Terrence, who is Kristina's brother and guardian, has been

4.

her primary caregiver since at least 2011.[3] At the time the underlying dispute arose, Terrence provided all of Kristina's HPC services hours.

{¶ 9} In 2017, the Ohio Department of Developmental Disabilities, which oversees the individual options waiver program at the state level, adopted Ohio Adm.Code 5123:2-9-03 in response to changes in federal overtime rules. The rule limits the time any single "independent provider" performing "any medicaid-funded services" can work in a week to 60 hours, effective February 1, 2018. Terrence is an "independent provider" and the HPC services that Kristina receives are "medicaid-funded services."

{¶ 10} BODD is the local administrator for the individual options waiver program. In late January 2018, BODD employees Lori Lawton, assistant director of service and support, and Erika Fisher, service and support administration coordinator, had a conference call with Terrence. According to Fisher's case notes documenting the call, they explained to Terrence that, although Kristina was still eligible for 112 hours of HPC services a week, Terrence would be limited to providing only 60 of those hours each week because of the new rule. To cover the remaining 52 hours per week, BODD suggested that Terrence could find additional providers to work with Kristina, send

---

[3] In his brief, Terrence says that he has provided all of Kristina's HPC services since 2005. For support, he cites our decision in *Mocznianski v. Ohio Dept. of Job & Family Servs.*, 195 Ohio App.3d 422, 2011-Ohio-4685, 960 N.E.2d 522, ¶ 6 ("From 2005 forward, [Kristina's] brother was paid 16 hours per day (112 hours per week) for the services he provides."). However, the administrative record in this appeal shows that Terrence has provided 112 hours of HPC services to Kristina since 2011. Regardless, the date Terrence began providing HPC services to Kristina is irrelevant to our decision.

5.

Kristina to "Day Services" five days a week, or transition Kristina from one-on-one HPC services to "Shared Living Services." Terrence declined these options. He told Lawton and Fisher that he was "grandfathered" from transitioning to shared living services because of an earlier Medicaid appeal that allowed him to provide all 112 hours of Kristina's HPC services. He also claimed that Kristina's immune system was compromised because of her low WBC count, she had dementia that was "progressing," and working with additional providers "would put Kristina's health at risk for serious illness and/or hospitalizations" and "would be detrimental to Kristina Mocznianski's emotional and physical well-being." BODD requested medical documentation to support Terrence's claims. Although he said he would provide the information within a week, BODD did not receive any medical records until almost five months later.

{¶ 11} In the meantime, on April 13, 2018, Lawton sent Terrence a letter informing him that BODD would only approve him to provide a maximum of 60 hours per week of HPC services beginning on May 13, 2018. According to case notes written on April 17, 2018, by Katie Screptock, a service and support specialist employed by BODD, Terrence said that Kristina had been diagnosed with leukemia. Although Kristina has leukopenia (low WBC count) and not leukemia (a type of blood cancer), Screptock's misstatement is irrelevant to this appeal.[4] Screptock also noted that she had

_____

[4] Indeed, the state hearing officer noted that "[t]here had been some discussion of cancer but that was dispelled at the hearing."

6.

spoken to Fisher, Lawton, and another manager about Kristina's health possibly making Terrence eligible to provide all of Kristina's HPC services. Later, on May 1, 2018, Screptock reminded Terrence by email that BODD needed information about Kristina's medical condition to consider making an exception to the overtime rules.

{¶ 12} On May 21, 2018, Lawton sent another letter to Terrence that included a Medicaid due process notice informing Kristina that she was approved for 112 hours per week of HPC services, with 60 of those hours provided by Terrence and 52 hours provided by another provider or providers. The explanation that BODD gave for the change was "[d]ue to overtime and limit on number of hours in a work week an Independent Provider may provide service."

{¶ 13} The next day, on May 22, 2018, Terrence emailed Lawton and Screptock information related to Kristina's compromised immune system. Included with his email were (1) a portion of Ohio Adm.Code 5123:2-9-03 with "(iii) The individual has a compromised immune system and may be put at risk by having <u>additional providers</u>" highlighted (emphasis sic); (2) a portion of an article from www.findatopdoc.com titled "Top reasons for low white blood cell count" with "Low white blood cell count is often a feature of immunodeficiency or a <u>compromised immune system</u>" highlighted (emphasis sic); and (3) a document with Kristina's name on it and the heading "CBC WITH AUTO DIFFERENTIAL – Past Results" that showed numeric values in a variety of different categories on six different dates with the results for "WBC" highlighted. The WBC values for Kristina were:

7.

| | | | |
|---|---|---|---|
| May 29, 2014: | 4.7 | April 3, 2017: | 2.8 |
| February 6, 2015: | 3.7 | April 11, 2017: | 3.8 |
| January 19, 2016: | 3.6 | November 21, 2017: | 3.2 |

The document listed the "Standard Range" for WBC as "4.8-10.8X10E9/L."

{¶ 14} After receiving the medical information from Terrence, BODD asked Dr. Michael Riethmiller, a physician with Mercy Health St. Vincent Medical Center Occupational Health Services, to review the CBC results and provide his opinion on "whether the WBC counts would constitute an immune deficiency so severe that only one Medicaid provider should provide services to this 50 year old woman."

{¶ 15} In his response, Dr. Riethmiller characterized the WBC counts in the test results as "low normal or below normal." He said that a low-normal number of WBCs is between 3,800 and 4,300, depending on the lab, and Kristina's counts dropped below that range twice, once in April 2017 and once in November 2017. He also said that it was important to look at the types of WBCs that were present. The two April 2017 tests—the only dates that included results for specific types of WBCs—showed that Kristina's percentage of lymphocytes was in the normal range, percentage of monocytes was in the slightly-above-normal range, and percentage of segmented neutrophils was in the low-normal to slightly-below-normal range. Dr. Riethmiller explained that, generally speaking, lymphocytes and monocytes protect the body from harmful viruses, while neutrophils protect the body from harmful bacteria. He went on to say that,

8.

[t]he only information submitted regarding whether or not more than one Medicaid provider should provide services to an individual with an immune deficiency was that of the white blood cell counts. However, the immune system is much more complicated since there are other factors involved including immunoglobulins, complement levels, and the presence of B&T cells. It would therefore be important to know whether or not any additional diagnostic studies have been performed in this situation to help determine the immune status of this individual. In addition, it would be important to know the history of this individual to determine whether or not he or she had developed repeated infections.

He concluded that, even though Kristina's WBC counts were in the low-normal to slightly-below-normal range, he did not "consider them to be at an unsafe level." He noted that, in general, doctors would not consider a person on chemotherapy, which can lower WBC counts, to have a compromised immune system until his or her WBC count fell to "approximately 1,000." He also opined that the number of providers Kristina had was unimportant; instead, it was important than any providers wear gowns, gloves, and face masks to prevent transmitting potentially infectious organisms to Kristina.

{¶ 16} To counter Dr. Riethmiller's opinion, Kristina submitted a letter from Dr. Feng Jiang, a physician with ProMedica Physicians Hematology/Oncology Associates. The letter stated, in its entirety, that "[h]er white blood cells are low, which results in her having a compromised immune [s]ystem. I would recommend limited exposure to

9.

multiple providers to decrease the risk of infection." Dr. Jiang's notes from a May 30, 2018 visit with Kristina stated that she "developed leukopenia back to 2013 * * *." He noted that Kristina's "blood counts has [sic] been stable in past 5 years * * *," and said that she could continue taking the medicine that he suspected was causing the leukopenia "as long as her neutrophil count is above a 1000 [sic] * * *." Although there was a possibility that Kristina's leukopenia was due to disease (not her medicine), Dr. Jiang did not recommend doing further diagnostic tests, such as a bone marrow biopsy, because the risks of the procedures outweighed the possible benefits. The visit note also said that Dr. Jiang gave Terrence a letter that day that "states that [Kristina] might have low immune system due to leukopenia, recommend to limit exposure to multiple providers to decrease the risk of infection."

{¶ 17} Based on this information, the state hearing officer overruled Kristina's appeal of BODD's decision to limit Terrence's HPC services provider hours. The hearing officer determined that BODD reduced Terrence's approved hours because of the 60-hour limit in Ohio Adm.Code 5123:2-9-03. Although BODD offered Terrence several options for reducing the number of hours of HPC services that he provided, he was unreceptive to the suggestions, primarily due to Kristina having a compromised immune system and not reacting well to strangers. Terrence's perception of Kristina's trouble with strangers was reinforced by testimony from Screptock and notes in Kristina's person-centered profile. However, at the hearing, Terrence testified that he would not be opposed to a family friend taking on some of Kristina's HPC services hours

10.

or to a third provider taking some of the hours once the third provider acclimated to Kristina's personality.

{¶ 18} The hearing officer found Dr. Riethmiller's report credible and, noting Dr. Riethmiller's conclusion that Kristina's WBC counts were not at an "unsafe" level, concluded that Kristina's low-normal WBC count would not prohibit her from "having three providers who work in concert to care for her."  Although Kristina's doctor was out of the country at the time of the hearing and her attorneys said that they could provide more information about Kristina's compromised immune system, the decision does not indicate that the hearing officer received any additional information from Kristina's doctor.  Additionally, the hearing officer rejected Kristina's argument that the "emergency" exception in Ohio Adm.Code 5123:2-9-03(D)(1)—which would allow Terrence to continue providing all 112 hours of HPC services—applied to her situation because an "'emergency' under the terms of the rule should be understood as 'temporary' in nature."

{¶ 19} In the administrative appeal, JFS reviewed the information presented at the state hearing and affirmed the hearing officer's decision.  JFS reached its conclusion because Terrence "at the state hearing indicated he did not object to additional providers and the slightly below normal white blood cell count could be addressed by proper protection procedures such as gloves, masks, etc."

{¶ 20} Following its review of the record, the Lucas County Court of Common Pleas affirmed JFS's decision.  The court found that neither party disputed that Kristina

11.

had a compromised immune system, but that there was reliable, probative, and substantial evidence that Kristina would not be put at risk by having additional providers. Although the common pleas court acknowledged some inconsistencies in Dr. Riethmiller's report—for example, saying he reviewed five sets of blood test results when the medical record has six sets of results and opining that Kristina's WBC levels are not unsafe without reviewing additional information about Kristina's health—the court did not "find these issues to be legally significant reasons to discredit the report." The court also pointed to additional evidence in the record showing that Kristina's health would not be put at risk by having multiple providers, including Dr. Jiang allowing for "limited exposure to multiple providers," Terrence's hearing testimony that he was not opposed to having other providers in the home, and evidence that Kristina is not restricted from contact with other people because she goes to restaurants, movies, and stores.

### III. Law and Analysis

### A. Standard of review for administrative appeals.

{¶ 21} In an administrative appeal under R.C. 119.12, the common pleas court reviews the entire record and determines whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. *Capital Care Network of Toledo v. Ohio Dept. of Health*, 153 Ohio St.3d 362, 2018-Ohio-440, 106 N.E.3d 1209, ¶ 24. "'Reliable' evidence is dependable or trustworthy; 'probative' evidence tends to prove the issue in question and is relevant to the issue presented; and 'substantial' evidence carries some weight or value." *Ohio Civ. Rights Comm. v. Case*

12.

*W. Reserve Univ.*, 76 Ohio St.3d 168, 178, 666 N.E.2d 1376 (1996), citing *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992). If the agency's decision is "supported by sufficient evidence and the law, the common pleas court lacks authority to review the agency's exercise of discretion * * *." *Capital Care Network* at ¶ 25.

{¶ 22} The scope of our review is much narrower: we review the common pleas court's decision for an abuse of discretion. *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707, 590 N.E.2d 1240 (1992). A trial court abuses its discretion where its decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 2019-Ohio-223, 131 N.E.3d 423, ¶ 13 (10th Dist.), citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard." *Id.*, citing *Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 10th Dist. Franklin No. 08AP-69, 2008-Ohio-3567, ¶ 11. And an unconscionable decision is one "that affronts the sense of justice, decency, or reasonableness." *Id.* In making this determination, we do not weigh the evidence. *Rossford Exempted Village School Dist.* at 707.

13.

{¶ 23} Where, however, questions of law are raised on appeal from an administrative agency, "both the common pleas court and the court of appeals exercise plenary powers of review." *Cameron v. Ohio Dept. of Transp.*, 108 Ohio App.3d 20, 23, 669 N.E.2d 874 (6th Dist.1995). The interpretation of an administrative rule is a question of law. *Averback v. Montrose Ford, Inc.*, 2019-Ohio-373, 120 N.E.3d 125, ¶ 16 (9th Dist.); *Howell v. Ohio Dept. of Job & Family Servs.*, 7th Dist. Belmont No. 08 BE 25, 2009-Ohio-1510, ¶ 29.

{¶ 24} With this standard of review in mind, we consider Kristina's assignments of error.

### B. Ohio Adm.Code 5123:2-9-03(D) is unambiguous and not subject to interpretation.

{¶ 25} In her first assignment of error, Kristina argues that the common pleas court erred in its interpretation of Ohio Adm.Code 5123:2-9-03. She essentially claims that—despite Ohio Adm.Code 5123:2-9-03(D)(3)(a)(iii) authorizing an exception to the overtime rule if the person being cared for has a compromised immune system and "may" be put at risk by having multiple providers—the common pleas court required proof of "more than a possibility of potential risk or [] some diagnosis or indication of a severe immunodeficiency in order to be limited to one Medicaid provider."

{¶ 26} In response, JFS contends that Kristina misconstrues the hearing officer's and common pleas court's decisions. That is, rather than reading the exception to apply only when the person in question has a severe immunodeficiency, the hearing officer

14.

determined that the evidence did not support a finding that Kristina might be put at risk by having multiple providers, and the common pleas court, after giving deference to the agency's findings of fact and interpretation of the rule, determined that the hearing officer's decision was supported by reliable, probative, and substantial evidence.

{¶ 27} At issue in this case is Ohio Adm.Code 5123:2-9-03(D), which states, in pertinent part:

(1) Beginning February 1, 2018, after an independent provider has worked sixty hours in a work week providing any medicaid-funded services as an independent provider, that independent provider may provide additional units of services under a home and community-based services medicaid waiver component administered by the department as an independent provider in that work week only:

(a) When authorized by the service and support administrator for the individual for whom the additional services are provided in accordance with paragraph (D)(3) of this rule; or

(b) Due to an emergency.

* * *

(3) As part of the assessment and person-centered planning process set forth in rule 5123:2-1-11 of the Administrative Code, an individual and his or her team shall identify known or anticipated events or circumstances

that will necessitate an individual's independent provider to exceed the limit established in paragraph (D)(1) of this rule.

(a) When known or anticipated events or circumstances will necessitate an individual's independent provider to exceed the limit, the events and circumstances, including authorization for the independent provider to exceed the limit for these specific events and circumstances, shall be addressed in the individual service plan. Examples of known or anticipated events or circumstances include but are not limited to:

* * *

(iii) The individual has a compromised immune system and may be put at risk by having additional providers[.]

{¶ 28} Courts interpret administrative rules in the same manner as statutes. *McFee v. Nursing Care Mgt. of Am., Inc.,* 126 Ohio St.3d 183, 2010-Ohio-2744, 931 N.E.2d 1069, ¶ 27. If a rule is ambiguous—i.e., it is subject to more than one reasonable interpretation—we can use all of the rules of statutory construction to determine the rule's meaning. *Internatl. Bhd. of Elec. Workers, Local Union No. 8 v. Vaughn Industries, Inc.*, 156 Ohio App.3d 644, 2004-Ohio-1655, 808 N.E.2d 434, ¶ 58 (6th Dist.), citing *Columbus & Franklin Cty. Metro. Park Dist. v. Shank*, 65 Ohio St.3d 86, 103, 600 N.E.2d 1042 (1992), fn. 17; *see also Turner v. Hooks*, 152 Ohio St.3d 559, 2018-Ohio-556, 99 N.E.3d 354, ¶ 12 ("A [rule] is ambiguous if a reasonable person can find different meanings in the [rule] and if good arguments can be made for either of two

contrary positions." (Internal quotations omitted.)). However, when a rule is unambiguous, we will not interpret it, but will apply it as written. *Internatl. Bhd. of Elec. Workers* at ¶ 58, citing *Columbus & Franklin Cty. Metro. Park Dist.* at 103.

{¶ 29} In applying an unambiguous rule, we give the words of the rule their plain and ordinary meaning. *In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 19, citing *State ex rel. Brilliant Elec. Sign Co. v. Indus. Comm.,* 57 Ohio St.2d 51, 54, 386 N.E.2d 1107 (1979). The word "may" is generally construed as "optional, permissive, or discretionary" unless there is a clear and unequivocal intent that it receive a different construction. *State ex rel. City of Niles v. Bernard*, 53 Ohio St.2d 31, 34, 372 N.E.2d 339 (1978), citing *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102, 271 N.E.2d 834 (1971). "May" is also defined as "[t]o be a possibility." *Black's Law Dictionary* 1127 (10th Ed.2014). The phrase "at risk" is not defined in Ohio Adm.Code Chapter 5123:2, but commonly means "exposed to a usu[ally] specified danger * * *." *Merriam Webster's Collegiate Dictionary* 1011 (10th Ed.1996); *see also Black's Law Dictionary* 1524 (10th Ed.2014) (defining "risk" as "the chance of injury * * *").

{¶ 30} After considering the rule, we see nothing in Ohio Adm.Code 5123:2-9-03(D) that is ambiguous or subject to more than one reasonable interpretation. Specifically, there is nothing clearly and unequivocally indicating that the word "may" in section (D)(3)(a)(iii) should not receive its ordinary construction. Accordingly, we will not interpret the rule, but will apply it as written.

17.

{¶ 31} As written, although section (D)(1) limits a service provider to working a maximum of 60 hours per week, section (D)(1)(a) allows the provider to exceed the 60-hour limit if the agency service and support administrator authorizes the provider to provide additional services. Any authorization must be done according to section (D)(3).

{¶ 32} Under section (D)(3), the person receiving services and her team—which, as defined in Ohio Adm.Code 5123:2-1-11(B)(14), includes, among others, the person's guardian, providers, and an agency service and support administrator—are required to identify events or circumstances that would require the provider to exceed the 60-hour limit and incorporate those situations—and any attendant authorization for overtime—in the person's individual service plan, which is "the written description of services, supports, and activities to be provided to an individual." Ohio Adm.Code 5123:2-1-11(B)(8).

{¶ 33} One of the bases in (D)(3) for authorizing overtime is when the person receiving services has a compromised immune system and "may" be put "at risk" by having more providers. Using the plain and ordinary meanings of "may" and "at risk" indicates that the exception in (D)(3)(a)(iii) is applicable when there is a possibility that the person receiving services would be exposed to danger or have a chance of being injured by having additional providers.

{¶ 34} While Kristina argues that the common pleas court improperly required proof of "more than a possibility of potential risk or [] some diagnosis or indication of a severe immunodeficiency in order to be limited to one Medicaid provider," we disagree.

18.

The common pleas court determined that there was reliable, probative, and substantial evidence that Kristina would not be put at risk by having additional providers—which tracks the language of section (D)(3)(a)(iii), and is logically synonymous with saying that, under the facts of this case, there is no possibility that Kristina would be exposed to danger.

{¶ 35} We therefore reject Kristina's argument that the common pleas court misinterpreted Ohio Adm.Code 5123:2-9-03(D)(3), and we find Kristina's first assignment of error not well-taken.

### C. The common pleas court did not abuse its discretion.

{¶ 36} In her second assignment of error, Kristina argues that the common pleas court abused its discretion by upholding the administrative decision because the court (1) relied on the "inaccurate and contradictory" report from Dr. Riethmiller, (2) improperly determined that Kristina would not be put at risk by additional caregivers based on her occasional exposure to other people in public, and (3) misconstrued Dr. Jiang's letter to permit limited exposure to multiple providers instead of reading the letter as "recommend[ing] that Kristina not be exposed to multiple providers up to 7 hours per day * * *." (Emphasis sic.)  JFS counters that Kristina misstates the findings made by the hearing officer and the common pleas court and her arguments "ignore how the undisputed facts contradict her position."  Our review of the record shows that the common pleas court did not abuse its discretion by finding that Ohio Adm.Code 5123:2-9-03(D)(3)(a)(iii) does not apply to Kristina.

19.

{¶ 37} The evidence in the record shows the following:

- Kristina had a low WBC count.

- Dr. Jiang, a hematologist and oncologist, found that Kristina had a compromised immune system due to her low WBC count.

- Dr. Jiang permitted Kristina to continue taking the medicine he suspected was causing the leukopenia as long as her neutrophil count was "above a 1000 [sic]."

- Dr. Riethmiller, an occupational medicine doctor, characterized Kristina's WBC count as "low normal or below normal" and said that the levels of her component WBCs (i.e., lymphocytes, monocytes, and neutrophils) ranged from slightly below normal to slightly above normal.

- Dr. Riethmiller said that information beyond WBC counts is required to determine whether someone's immune system is compromised.

- Regardless, Dr. Riethmiller concluded that Kristina's WBC counts were not "at an unsafe level."

- Dr. Jiang recommended "limited exposure to multiple providers to decrease the risk of infection."

- Dr. Riethmiller, on the other hand, opined that the number of providers Kristina had was unimportant, as long as the providers took precautions

(like wearing gowns, masks, and gloves) to avoid transmitting infectious organisms.

- Despite her low WBC count, Kristina was exposed to other people in public settings such as restaurants and movie theaters.

- At the time of the appeal, Kristina was only exposed to one provider—Terrence, her brother—who helped with intimate tasks of daily living such as eating and bathing.

{¶ 38} Conspicuously absent from this list is information regarding risk to Kristina. That is, Kristina submitted very little evidence showing that there was a possibility that she may be put at risk by having additional providers.

{¶ 39} The only evidence that Kristina submitted regarding risk was Dr. Jiang's letter, in which he "recommend[ed] limited exposure to multiple providers to decrease the risk of infection." Rather than reading Dr. Jiang's letter as forbidding multiple providers, the common pleas court interpreted the letter as giving permission for Kristina to have some—albeit limited—exposure to more than one provider. This interpretation was not unreasonable, arbitrary, or unconscionable, and we cannot find that the common pleas court's reading of Dr. Jiang's letter was an abuse of discretion.

{¶ 40} Kristina also complains that the common pleas court improperly found that she would not be put at risk by having multiple providers because she was exposed to other people in public places. She argues that there is an "obvious difference" between

short public outings[5] and being exposed to a provider for up to seven hours a day.  This argument is not supported by the record.  Specifically, nothing in the record quantifies the amount of risk—if any—that Kristina is exposed to by being in public or compares that risk to the level of risk she would or could be exposed to at home by having additional HPC services providers.  Without evidence to the contrary, it was not unreasonable, arbitrary, or unconscionable for the common pleas court to find that Kristina's exposure to other people in public supported JFS's conclusion that Kristina would not be put at risk by exposure to other people in her home.

{¶ 41} Finally, Kristina takes issue with Dr. Riethmiller's report for three reasons. First, she complains that he issued an opinion based only on limited information (i.e., Kristina's WBC counts) while noting that other information—specifically results of other diagnostic tests or a history of repeated infections—would be "important to know."  But it was Kristina's burden to demonstrate the applicability of the section (D)(3)(a)(iii) exception, and Terrence did not provide BODD with any diagnostic tests or medical information other than the few blood test results showing low WBC counts.  Moreover, Dr. Riethmiller's opinion was properly limited to the information that he had, which was

---

[5] There is nothing in the record showing the frequency or duration of Kristina's public outings.  Even so, Kristina claims that, because of her temperament and behavioral issues, "even if she does go out on occasion, it is more than obvious that these outing are not for extended periods of time."

22.

the test results that Terrence provided to BODD—stating that Kristina's WBC counts, specifically, were not at an "unsafe level."[6]

{¶ 42} Second, Kristina points out that Dr. Riethmiller stated that he reviewed five sets of test results when Kristina's records contained six sets of test results. There is nothing to suggest that Dr. Riethmiller's reference to five sets of results instead of six sets of results was anything more than a typographical error.

{¶ 43} Finally, Kristina argues that Dr. Riethmiller ignored the fact that all of her WBC results "clearly indicated that they were under the standard range." We acknowledge the apparent discrepancies in the "low normal" range for WBC counts that Dr. Riethmiller provided ("between 3,800 and 4,300") and the "Standard Range" included with Kristina's blood test results ("4.8-10.8X10E9/L") and Dr. Riethmiller's interpretation of the test results as falling "below normal levels" only twice. However, given that no one disputes that Kristina has a compromised immune system, the common pleas court did not err by accepting Dr. Riethmiller's conclusion that Kristina's WBC counts were low only in April and November of 2017 as reliable, probative, and substantial evidence supporting the administrative ruling. Dr. Riethmiller found that her WBC counts were not low enough to be concerning and that the number of providers she

---

[6] He justified this statement by saying that doctors are generally not concerned about patients on chemotherapy (which can decrease WBC counts) having compromised immune systems until their WBC counts fall below 1,000. Incidentally, Dr. Jiang's notes in Kristina's medical records lend some support to this conclusion. He allowed Kristina to continue taking the medicine that he believed was causing the leukopenia as long as her neutrophil count stayed above 1,000.

23.

had was not important, assuming that the providers took appropriate precautionary measures.

{¶ 44} Given all of this information, we cannot say that the common pleas court acted in an unreasonable, arbitrary, or unconscionable manner by finding that the identified issues with Dr. Riethmiller's report were not "legally significant" enough to discredit his conclusions.

{¶ 45} In sum, the common pleas court did not abuse its discretion by finding that JFS's decision was supported by reliable, probative, and substantial evidence and was in accordance with law. Kristina did not present evidence that she "may be put at risk by having additional providers," so the common pleas court did not err in affirming JFS's decision that the exception to the overtime rule in Ohio Adm.Code 5123:2-9-03(D)(3)(a)(iii) did not apply to her. Accordingly, Kristina's second assignment of error is not well-taken.

## IV. Conclusion

{¶ 46} Based on the foregoing, the March 25, 2019 judgment of the Lucas County Court of Common Pleas is affirmed. Kristina is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Arlene Singer, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.